**Kenneth Allen GREENE**

v.

**The JOHNS HOPKINS UNIVERSITY and Employment Security Administration.[1]**

**Civ. A. No. N–78–761.**

United States District Court,
D. Maryland.

April 11, 1979.

---

1. Plaintiff originally brought this action against the Johns Hopkins University. However, he has filed subsequent amendments to his complaint, on November 3 and November 16, 1978, which also name the Maryland Employment Security Administration and Robert J. Schuerholz, his supervisor at the University, as defendants and add a Title VII claim to his previous claims under § 1981, § 1983 and § 1985(3). At pp. 190 191 *infra*, this Court accepts, for purposes of this opinion, all of the plaintiff's amendments. The Court will address all of the defendants and legal claims raised in those pleadings.

Kenneth Allen Greene, plaintiff pro se.

Estelle A. Fishbein, of Baltimore, Md., for defendant The Johns Hopkins University.

Stephen H. Sachs, Atty. Gen. of Maryland, Joel J. Rabin and Sherry L. Kendall, Asst. Attys. Gen., Baltimore, Md., for defendant Employment Security Administration.

NORTHROP, Chief Judge.

This is an action brought by Kenneth Allen Greene a pro se plaintiff charging the Johns Hopkins University with violations of the Fair Labor Standards Act, 29 U.S.C. § 214(b)(4)(A), and the Civil Rights Statutes, 42 U.S.C. §§ 1981, 1983, and 1985, for allegedly failing to place him under the proper employment classification, firing him for a discriminatory reason, and conspiring with the Maryland Employment Security Administration (ESA) to deprive him of unemployment compensation benefits. The plaintiff asserts that 28 U.S.C. §§ 1331, 1337, and 1343 are the jurisdictional bases upon which this Court can entertain the case.

On May 30, 1978, defendant, Johns Hopkins University (Hopkins), filed a motion to dismiss or, in the alternative, a motion for partial summary judgment on all but the § 1981 claim. In ruling on this kind of motion, the Court must view the complaint in the light most favorable to the plaintiff and must accept the truthfulness of the factual allegations in the complaint. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). Furthermore, the plaintiff's status as a pro se civil rights litigant requires that the Court carefully examine the complaint to see whether the facts alleged, or the set of facts that the plaintiff could be able to prove, may provide a basis for recovery under the Civil Rights Acts or other "heads of jurisdiction in the federal arsenal for redress of constitutional deprivations." *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir.), *cert. denied,* ——— U.S. ———, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).

On September 15, 1978, the Court held a hearing on the defendant Hopkins' motion to dismiss or for alternative relief. At the conclusion of oral argument, the Court issued an oral opinion in which it ruled that the plaintiff's first substantive claim, a violation of the Fair Labor Standards Act, 29 U.S.C. § 214(b)(4)(A), was defective. The opinion set forth the reasons for that conclusion:

A reading of the statute and the legislative history of the Fair Labor Standards

Act leads this Court to conclude that the certification procedure and maximum hours limitations of that section are applicable only to full-time students who are employed at less than the minimum wage. The pleadings in this case show that the plaintiff was employed at a wage rate higher than the minimum wage throughout his period of employment with the University.

From the legislative history, it appears that Congress intended that the certification procedure and maximum work hours limitation would insure that student employment would not detrimentally affect members of the full time work force seeking employment. It seems logical that employment of students at rates greater than the minimum wage would not seriously damage the opportunities of members of the normal work force and, therefore, this Court concludes that 29 U.S.C. § 214(b)(4)(A) is inapplicable to this plaintiff under any interpretation of the statutory language and legislative history.

*Transcript* at 4. The Court also stated that insufficient facts had been pleaded to permit a determination of whether a cause of action might lie under either § 1983 or § 1985 of the civil rights statutes. To obtain sufficient facts to resolve the threshold state action inquiry under § 1983, the Court directed the defendant to provide the following information: (1) an affidavit outlining state and federal funds received by the University from 1972 through 1978; and (2) documents that show the source of funding for the plaintiff's employment. The Court also requested the parties to file memoranda outlining the factual and legal bases supporting or negating state action in this case.[2]

To further clarify the possibility of jurisdiction on the basis of § 1985, the Court directed the plaintiff to amend his complaint to include the director of Maryland's

Employment Security Administration as a defendant and "to supplement, with specificity, his allegations of conspiratorial activity on the part of the University and the Employment Security Administration." *Transcript* at 6. Finally, the Court asked the defendant to re-examine the plaintiff's § 1981 claim in light of the decision to dismiss the Fair Labor Standards Act claim. *See Transcript* at 3.

In response to the Court's directions, the plaintiff filed a pleading on October 2, 1978, which outlined his arguments in support of a finding of state action in this case. Defendant Hopkins answered with a motion to dismiss or, in the alternative, a motion for summary judgment on all of the claims in the complaint. On November 3, 1978, the plaintiff filed an amended complaint that named both the Johns Hopkins University and the Employment Security Administration as defendants. On November 16, 1978, the plaintiff requested leave of the court to file another amended complaint that would add Robert J. Schuerholz (plaintiff's supervisor at the University) as a defendant and allege a Title VII claim (42 U.S.C. § 2000e *et seq.*), as well as all of the other claims previously delineated in prior complaints. The defendant has opposed this amendment to the complaint. *See* defendant Hopkins' *Answer to Motion for Leave to File an Amended Complaint*, filed November 27, 1978.

The plaintiff has explained his recurring amendments as a misinterpretation of the Court's directions at the September 15, 1978 hearing. The Court finds this mistake highly unlikely considering plaintiff's education, the quality of his pleadings, and his repeated assertions at the hearing that he understood exactly what the Court had requested from him. Nevertheless, due to the liberality allowed to the pro se civil rights litigant by the law of this circuit, *see Gordon v. Leeke, supra*, the Court will accept

---

2. The Court spent a considerable amount of time during the hearing clarifying the purpose of this memorandum for the plaintiff. *See* Transcript at 8–16. The Court also discussed with the plaintiff the particular theories he might use to demonstrate state action by the defendant and directed him to research *Weise v. Syracuse University*, 522 F.2d 397, 407 n.11 (2d Cir. 1975) for a state action theory contained therein.

plaintiff's amended complaints filed on October 2, 1978, November 3, 1978, and November 16, 1978. However, the Court will not accept any further amendments of the complaint in this case.

The Court will now proceed to rule on the outstanding motions. In judging the relative merit of the plaintiff's claims, the Court will consider the additional evidence furnished by the parties subsequent to the September 1978 hearing and, where appropriate, will grant summary judgment on particular issues. *See* 5 C. Wright & A. Miller, *Federal Practice and Procedure*, Civil § 1366 (1969).

### Factual Background

The plaintiff first became associated with the Johns Hopkins University as a student in the Spring of 1973 when the University accepted his application for enrollment in the undergraduate class matriculating in the Fall of 1973. From that time until his graduation in May 1977, Mr. Greene received substantial financial aid from the University—$12,200 in grants and $4,300 in loans. *See Defendant's Memorandum in Support of Motion to Dismiss*, filed May 30, 1978. Mr. Greene's employment with the University began in September 1974 when he applied for the position of part-time telephone operator. At the time of his hiring, Mr. Greene was found eligible for work-study funds and was classified as a temporary undergraduate assistant, with a starting wage of $2.42 per hour. As his employment continued during his undergraduate career at the University, Mr. Greene's wage rate increased several times; his hours worked increased as well, especially after February 28, 1975 when he was given permission to work more hours than the normal amount allowed a full-time student.

In May 1977, the plaintiff graduated from Johns Hopkins University. After graduation, he continued his employment with the University as a part-time telephone operator. He asked his supervisors during this period whether he would receive the personnel benefits given to permanent University employees. His supervisors allegedly informed him that he would not receive these benefits since he was still a casual employee. Mr. Greene, however, continued in the classification "temporary undergraduate assistant," until October 10, 1977 when he was reclassified as a casual employee. At that time, University personnel officers informed him that he would still be unable to receive personnel benefits since they were given only to permanent, and not casual, employees. Plaintiff contends that this position was erroneous since University personnel policy required the personnel office to reclassify him as a permanent employee, either full or part-time, and thus make him eligible for personnel benefits.

In January 1978, the plaintiff had several negative employment experiences. First, on January 13, 1978, University security police officers received a telephone call from the University Rathskellar that the telephone operator had not responded to a call for a security escort. University security officers proceeded to the Communications Center where they found the plaintiff asleep at the switchboard. The officers also allegedly detected the odor of marijuana in the plaintiff's work area. The same situation occurred on January 20, 1978, when the plaintiff again failed to answer the Rathskellar call and University security officers again found him asleep at the switchboard. These incidents were reported to Mr. Greene's supervisor, Mr. Robert J. Schuerholz.[3] On January 20, 1978, Mr. Greene fell

---

3. These were not the only incidents of this nature involving the plaintiff that had come to the attention of the University. In its May 30, 1978 Memorandum in support of its Motion to Dismiss the Complaint, the defendant University outlined the plaintiff's disciplinary history: (1) on January 13, 1976, Mr. Greene was given a verbal reprimand for delinquency in answering switchboard calls; (2) on July 10, 1977, Mr. Greene was found asleep on the job; (3) on October 17, 1977, a University student sent a written complaint to the Director of Student Activities characterizing an unidentified switchboard operator, later identified as Kenneth Greene, as "consistently slow and rude." In his amended complaints, Mr. Greene has

down some icy steps leading to his work area. He reported his injuries to his immediate supervisor on that day and presented a formal accident report to Mr. Schuerholz on January 24, 1978.

On January 24, 1978, Mr. Schuerholz informed the plaintiff that his employment with the University would be terminated for his misconduct. Mr. Schuerholz referred to reports he had received that Mr. Greene was found asleep by security officers on January 13 and 20, 1978. The plaintiff alleges that Mr. Schuerholz permitted him the option of working two more weeks or immediately resigning and then rescinded that option on January 27, 1978, when he informed Mr. Greene that he was involuntarily terminated for misconduct.

Plaintiff asserts that the University, in terminating his employment, did not follow the procedures prescribed by its personnel policy manual. Plaintiff also contends that the University hired a white student to fill the vacancy left by his termination. He alleges that the University hired this student because his wages could be reimbursed under the federal and state financed work-study program. Furthermore, according to plaintiff, another student subsequently was determined to be eligible for the personnel benefits previously denied to the plaintiff, even though he performed the same function and worked the same amount of hours. Finally, the plaintiff contends that his own status as a nonstudent and the department's inability to obtain reimbursement for his wages was the motivating factor behind his termination and the white student's hiring.

In February 1978, the plaintiff filed for unemployment compensation benefits with the State Employment Security Administration. Due to administrative difficulties which the plaintiff alleges were caused by the University, he was not declared monetarily eligible for benefits until June 22, 1978. In the interim, Mr. Greene had filed the instant complaint in this Court on May 2, 1978. On July 7, 1978, a hearing was held by the Employment Security Administration to determine Mr. Greene's eligibility for benefits. At the hearing, Frederick De-Kuyper, Hopkins' assistant general counsel, Robert Schuerholz, plaintiff's supervisor at Hopkins, and Estelle Fishbein, Hopkins' counsel, testified. The testimony, and an incident report submitted at the hearing, focused on the alleged occurrences of misconduct on January 13 and 20, 1978. On July 28, 1978, the hearing officer notified the plaintiff of his finding that the plaintiff had been terminated for gross misconduct. Under Maryland Unemployment Insurance Law, an employee terminated for gross misconduct cannot obtain benefits. The plaintiff appealed this decision and, on August 21, 1978, a further hearing was held in this matter by the Employment Security Administration. The plaintiff contends that the appeals referee severely restricted the evidence he wished to present at this hearing by not insuring that the persons and documents the plaintiff had subpoenaed were available, and by not permitting the presentation of the tapes and testimony received at the July 7, 1978 hearing, or the submission of evidence resulting from the civil action in this Court. The appeals referee issued a decision on September 11, 1978 upholding the original finding of gross misconduct. Mr. Greene requested a further review of his case by the Agency's Board of Appeals. The Board denied this request on October 4, 1978.

*Legal Background*

Plaintiff originally brought this action against Johns Hopkins University, as the sole defendant, claiming violations of 29 U.S.C. § 214(b)(4)(A), and 42 U.S.C. §§ 1981, 1983, and 1985. The plaintiff proffered 28 U.S.C. §§ 1331, 1337, and 1343 as potential jurisdictional bases. Subsequently, the Court dismissed the plaintiff's claim under 29 U.S.C. § 214(b)(4)(A) and thereby removed 28 U.S.C. §§ 1331 and 1337 as possi-

confronted and attempted to explain these incidents in his employment history. However, the plaintiff's explanations have only focused on the alleged discriminatory motivations underlying these incidents and have not contradicted the fact that they occurred.

ble jurisdictional supports for this suit. The plaintiff also has amended his complaint to name the Employment Security Administration and Robert J. Schuerholz as defendants and add a claim under 42 U.S.C. § 2000e *et seq.* Thus, in its present posture, the case has three defendants, Johns Hopkins University, Employment Security Administration, and Robert J. Schuerholz, and four legal claims, 42 U.S.C. §§ 1981, 1983, 1985, and 2000e. The Court will resolve the validity of each of these claims as they affect each of the defendants, seriatim.

### A. § 1981 Claim.

42 U.S.C. § 1981 states:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

This section of the civil rights statutes is an equalizing provision which seeks primarily to ensure that contractual rights do not vary according to race. *See Long v. Ford Motor Co.,* 496 F.2d 500 (6th Cir. 1974). *See generally Tillman v. Wheaton-Haven Recreation Ass'n.,* 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973). To state a claim under § 1981, a plaintiff must allege deprivation of rights which, under similar circumstances, would have been accorded to a person of a different race. While civil rights complaints must be liberally construed, *see Escalera v. New York City Housing Authority,* 425 F.2d 853, 857 (2d Cir.), *cert. denied,* 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970), the pleading is plainly insufficient unless it contains some specific allegations of fact indicating a deprivation of civil rights, rather than stating simple conclusions. *See Powell v. Jarvis,* 460 F.2d 551, 553 (2d Cir. 1972); *cf. Burt v. Stop & Shop Companies, Inc.,* 403 F.Supp. 609, 611 (D.Mass.1975).

Under § 1981, plaintiff apparently claims that the Johns Hopkins University denied him employment benefits that he would have received if his employment was given proper status. In support of this claim, he presents the following facts: (1) he was fired allegedly because he was no longer eligible for work-study funds and could only be retained as an employee if given personnel benefits; (2) a white student allegedly was hired to replace him because that student was eligible for work-study funds; and, (3) another white student, performing the same function at the same number of hours as the plaintiff, allegedly received personnel benefits from the University at an unspecified date after Mr. Greene's termination.

These allegations are plainly insufficient to support a cause of action under § 1981. The only contention that comes even in the proximity of facts which may support a § 1981 claim is the assertion that another white student received personnel benefits when the plaintiff did not. The plaintiff, however, has provided no factual support for the contention, and admits that the alleged award occurred subsequent to his termination. Without evidence that the plaintiff and the white student were similarly situated workers at the time of the alleged discrimination and that the University placed more stringent requirements on plaintiff's receipt of personnel benefits, the plaintiff's conclusory allegation cannot stand. *See Long v. Ford Motor Co., supra* at 505. The lack of merit in the plaintiff's claim becomes even more apparent when one considers the length of Mr. Greene's employment (3 years and 4 months), *see Burt v. Stop & Shop Companies, Inc., supra* at 611 (length of employment circumstantial evidence tending to disprove racial bias), and his student status and receipt of substantial amounts of financial aid from the University throughout most of this period. Furthermore, the University's practice of hiring an appreciably higher percentage of black students than whites during the years of plaintiff's employment strongly negates any inference of racial discrimination that the plaintiff seeks this Court to draw

from the University's failure to properly classify his employment and afford him the personnel benefits that accompany certain classifications. Therefore, in viewing this evidence in light of the plaintiff's repeated attempts at successful amendment of his complaint, the Court concludes that summary judgment in favor of the defendants is appropriate on the § 1981 claim.

## B.  *§ 1983  Claim.*

To assert a claim under § 1983, the plaintiff must show that the defendant acted under the color of state law.  Since the Employment Security Administration is a defendant only with respect to the § 1985 claim, its involvement in this suit does not supply the requisite state action.  The plaintiff, then, must demonstrate that the financial and governing structure and the activities of the Johns Hopkins University support a finding of state action.  The plaintiff has proffered one major theory in support of this finding.  He asserts that the State has provided the University with such assistance in the form of "funds for restricted use, funds for unrestricted use, imputed consideration, and/or reimbursements, that [the University] can be held liable under § 1983 as a result of the sum total effect of assistance, insurance, and consideration received from the public sector."  *See* plaintiff's *Amended Pleadings*, filed October 2, 1978, at 6–7.

The Court has permitted the plaintiff to supply additional facts supporting his theory and has requested the University to provide records of state funding in its annual budget for the period 1972–78.  From this information, the Court has culled the following facts relevant to the state action inquiry.  First, the level of state funding in the University's budget ranged from .4% to 2.7% in the 1972–78 period.  Secondly, all responsibility for governance of the University resides in a Board of Trustees and no government body or public officials have a role in the appointment or selection of these trustees.  Thirdly, the state of Maryland neither controls nor approves the activities of the Johns Hopkins University.  Fourthly, the University normally operates at a deficit and, as a nonprofit educational institution, receives a tax exempt status from the State.  Lastly, funds for plaintiff's employment were obtained from a departmental budget and reimbursement for his wages was not sought from the State under the federal and state financed work-study program.

## C.  *The State Action Requirement.*

The Supreme Court has sanctioned two theories upon which a finding of state action may be based in this type of case.  First, in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the Court approved the proposition that the existence of a symbiotic relationship between the State and a private party engaging in illegal discrimination may make the State a joint participant in the unlawful conduct, thereby bringing the discrimination within the purview of the fourteenth amendment.  In *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), the Court confirmed the presence of a second state action theory—a close nexus between the State's involvement with the private party and the alleged discriminatory activity—when it focused on the question of whether the State directly fostered or encouraged the discriminatory policy or practice in that case.  *See id.* at 175–79, 92 S.Ct. 1965.  However, the Court has never clarified the extent to which each of these theories must be satisfied before state action can lie in a particular case.[4]

---

4.  *Greco v. Orange Memorial Hospital Corp.*, 513 F.2d 873 (5th Cir.), *cert. denied*, 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975), presented an opportunity to resolve this point of clarification, but the Court declined to grant certiorari on the issue due to docket pressures, even though Justice White, joined by Chief Justice Burger, argued persuasively for the acceptance of the question to resolve a conflict in the lower federal courts.  *See Greco v. Orange Memorial Hospital Corp.*, 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975) (White, J. & Burger, C. J., dissenting from denial of certiorari).

In the absence of a clarification, the circuit courts have differed on the proper weight to be placed on each theory. Several circuits, emphasizing the broad inquiry outlined in *Burton*, have ruled that a finding of state action may be based solely on the "overall relationship" theory.[5] In some of these cases, the relevant state involvement has been limited to the allocation of funds to the private party.[6] In contrast, other circuits have required some greater involvement of the State with the private party and have demanded that a close nexus between the State involvement and the discriminatory activity be shown before state action can lie.[7] These cases generally have reflected the recent trend in the Supreme Court of limiting the kinds of factual situations that may give rise to state action.[8]

Overall, the direction of lower court cases appears to be shifting toward the more narrow scope of state action review requirement. The case law in the Fourth Circuit presents an excellent example of this shift in balance between the overall relationship and close nexus theories.[9] Traditionally, the state action question has arisen, in this Circuit, in the context of activities related to hospitals constructed through federal and state funding under the Hill-Burton program,[10] and low income housing constructed and operated under the National Housing Act.[11] In the seminal case, *Simkins v. Moses H. Cone Memorial Hospital*, 323 F.2d 959 (4th Cir. 1963), *cert. denied*, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964), which involved a claim of racial discrimination brought by black physicians against a hospital funded under the Hill-

5. See Braden v. University of Pittsburgh, 552 F.2d 948, 957 (3d Cir. 1977) (en banc); Christhilf v. Annapolis Emergency Hosp. Ass'n, 496 F.2d 174 (4th Cir. 1974); O'Neill v. Grayson County War Memorial Hosp., 472 F.2d 1140 (6th Cir. 1973); Simkins v. Moses H. Cone Memorial Hosp., 323 F.2d 959 (4th Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964).

6. See, e. g., Doe v. Charleston Area Medical Center, Inc., 529 F.2d 638 (4th Cir. 1975); Christhilf v. Annapolis Emergency Hospital Ass'n, 496 F.2d 174 (4th Cir. 1974); Sams v. Ohio Valley General Hospital Ass'n, 413 F.2d 826 (4th Cir. 1969); Eaton v. Grubbs, 329 F.2d 710 (4th Cir. 1964); Large v. Reynolds, 414 F.Supp. 45 (W.D.Va.1976). See also Rackin v. University of Pennsylvania, 386 F.Supp. 992 (E.D.Pa.1974).

7. See, e. g., Life Ins. Co. of North America v. Reichardt, 591 F.2d 499 (9th Cir. 1979); Schlein v. Milford Hosp., Inc., 561 F.2d 427 (2d Cir. 1977); Cannon v. University of Chicago, 559 F.2d 1063 (7th Cir. 1976), cert. granted, 438 U.S. 914, 98 S.Ct. 3142, 57 L.Ed.2d 1159 (1978); Greco v. Orange Memorial Hospital Corp., 513 F.2d 873 (5th Cir.), cert. denied, 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975); Ward v. St. Anthony Hosp., 476 F.2d 671 (10th Cir. 1973).

8. See, e. g., Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970). See also Note, State Action and the Burger Court, 60 Va.L.Rev. 840

(1974); Note, State Action: Theories for Applying Constitutional Restrictions to Private Activity, 74 Colum.L.Rev. 656 (1974).

9. Compare Walker v. Pierce, 560 F.2d 609 (4th Cir. 1977), cert. denied, 434 U.S. 1075, 98 S.Ct. 1266, 55 L.Ed.2d 782 (1978) and Doe v. Charleston Area Medical Center, Inc., 529 F.2d 638 (4th Cir. 1975) with Christhilf v. Annapolis Emergency Hospital Ass'n, 496 F.2d 174 (4th Cir. 1974) and Simkins v. Moses H. Cone Memorial Hosp., 323 F.2d 959 (4th Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964). See generally, Fourth Circuit Review, 35 Wash. & Lee L.Rev. 433, 457–62 (1978).

10. See, e. g., Walker v. Pierce, 560 F.2d 609 (4th Cir. 1977), cert. denied, 434 U.S. 1075, 98 S.Ct. 1266, 55 L.Ed.2d 782 (1978); Doe v. Charleston Area Medical Center, Inc., 529 F.2d 638 (4th Cir. 1975); Duffield v. Charleston Area Medical Center, Inc., 503 F.2d 512 (4th Cir. 1974); Christhilf v. Annapolis Emergency Hospital Ass'n, 496 F.2d 174 (4th Cir. 1974); Sams v. Ohio Valley General Hospital Ass'n, 413 F.2d 826 (4th Cir. 1969); Smith v. Hampton Training School for Nurses, 360 F.2d 577 (4th Cir. 1966); Simkins v. Moses H. Cone Memorial Hosp., 323 F.2d 959 (4th Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964); Large v. Reynolds, 414 F.Supp. 45 (W.D.Va.1976).

11. See Joy v. Daniels, 479 F.2d 1236 (4th Cir. 1973); Anderson v. Denny, 365 F.Supp. 1254 (W.D.Va.1973). See also Eaton v. Grubbs, 329 F.2d 710 (4th Cir. 1964) (state and federal capital construction subsidies).

Burton program, Judge Sobeloff adopted the *Burton* Court's broad factual inquiry as the appropriate standard of review and focused on the hospital's receipt of Hill-Burton funds. Judge Sobeloff found that the receipt of federal-state funding, along with the private parties need to conform to certain regulations to obtain the funds, supplied the requisite state action. 323 F.2d at 967–69. In subsequent cases involving Hill-Burton funds and similar programs, the Fourth Circuit and its district courts have consistently followed *Simkins* and found state action to be present even though a close nexus did not exist between the State's involvement and the discriminatory activity.[12]

In recent years, the Fourth Circuit has given indications that the *Simkins* line of cases is no longer in the mainstream of judicial interpretation of the state action requirement. In *Doe v. Charleston Area Medical Center, Inc.*, 529 F.2d 638 (4th Cir. 1975), for example, the court recognized the conflict in the circuits over whether Hill-Burton funding alone satisfies the state action requirement. *Id.* at 642–43 & n.10. The court observed that this difference in opinion arose from the inclination of several other circuits to require the existence of a close nexus before state action can lie. *Id.* However, the court, in *Doe*, avoided any further explanation of the conflict by holding that a close nexus did exist between the State's involvement and the discriminatory activity. *Id.* at 644. In a subsequent case, *Walker v. Pierce*, 560 F.2d 609 (4th Cir. 1977), *cert. denied*, 434 U.S. 1075, 98 S.Ct. 1266, 55 L.Ed.2d 782 (1978), which involved Hill-Burton funding of a hospital but which did not include facts showing a close nexus, the court confronted this issue of whether the receipt of Hill-Burton funds, standing alone, may support a finding of state action

against a physician working at the hospital. The court answered in the negative, finding state action wanting under either the overall relationship or close nexus theories and explicitly stating that Hill-Burton funds, by themselves, do not supply state action against the physician. *Id.* at 613. However, the court failed to discuss the *Simkins* line of cases which, as the dissenting opinion clearly pointed out, *see id.* at 613–15 (Butzner, J., dissenting), required a finding of state action in the case on the basis of the federal-state funding.

The *Doe* and *Walker* cases reflect a growing tendency on the part of the Fourth Circuit to disregard the lesser state action requirements embodied in *Simkins* and to adopt, instead, a stricter standard of review by emphasizing the need for a close nexus between the State involvement and the discriminatory activity. Nevertheless, the court's reluctance to confront and specifically overrule *Simkins* has left the present state of the law in question.

The plaintiff's assertion in the present case that the Court has § 1983 jurisdiction over a private university with which the state has involved itself brings a novel factual situation to the already unsettled area of state action in this circuit. Other courts, however, have confronted the state action question in this context and have reached contrary conclusions.[12A] This lack of unanimity has been caused by important factual distinctions and divergent legal standards. In *Rackin v. University of Pennsylvania*, 386 F.Supp. 992 (E.D.Pa.1974), for example, the district court found state action on the basis of the University's receipt of substantial funds from the State, which represented 25% of the institution's "hardcore" budget, and the inference that such significant funding permitted the State to

---

**12.** *See, e. g., Duffield v. Charleston Area Medical Center, Inc.*, 503 F.2d 512 (4th Cir. 1974); *Christhilf v. Annapolis Emergency Hospital Ass'n*, 496 F.2d 174 (4th Cir. 1974); *Sams v. Ohio Valley General Hospital Ass'n*, 413 F.2d 826 (4th Cir. 1969); *Smith v. Hampton Training School for Nurses*, 360 F.2d 577 (4th Cir. 1966); *Large v. Reynolds*, 414 F.Supp. 45 (W.D.Va. 1976).

**12A.** *Compare Rackin v. University of Pennsylvania*, 386 F.Supp. 992 (E.D.Pa.1974) *with Cannon v. University of Chicago*, 559 F.2d 1063 (7th Cir. 1976), *cert. granted*, 438 U.S. 914, 98 S.Ct. 3142, 57 L.Ed.2d 1159 (1978) (No. 77–926).

wield "considerable influence over the University." *Id.* at 997. In reaching that conclusion, the *Rackin* court also construed Supreme Court case law as permitting a finding of state action on either the overall relationship theory of *Burton* or the close nexus theory of *Moose Lodge* and grounded state action in *Rackin* on the former theory alone. *Id.* at 1002–05. In contrast, the Second Circuit in *Weise v. Syracuse University*, 522 F.2d 397 (2d Cir. 1975) and *Powe v. Miles*, 407 F.2d 73 (2d Cir. 1968), and the Seventh Circuit, in *Cannon v. University of Chicago*, 559 F.2d 1063 (7th Cir. 1976), *cert. granted*, 438 U.S. 914, 98 S.Ct. 3142, 57 L.Ed.2d 1159 (1978), have confronted arguments that the activity of the institutions in question was state action because of receipt of financial assistance from the State and have concluded that state action was not present. Although the degree of state funding may distinguish these cases from *Rackin*, both courts rejected the *Rackin* legal standard by premising their findings on the need for a close nexus between the state involvement and the discriminatory activity and observing that, without a close nexus, funding alone would not support § 1983 jurisdiction. Other courts also have ruled that funding, especially if limited in nature, will not supply state action, even assuming, as the *Rackin* court did, that § 1983 jurisdiction may be based either on the overall relationship or close nexus theories.[13]

The significance of funding to the finding of state action is crucial to the present case since State direct financial assistance and indirect aid through the grant of tax exempt status are the grounds upon which the plaintiff builds his argument for § 1983 jurisdiction. In this case, that funding was not used to· pay the plaintiff's wages. Therefore, jurisdiction cannot be founded on the close nexus theory. Nor can the funding satisfy the overall relationship theory under the private university-state action cases. The financial assistance has been minimal, ranging from .4% to 2.7% of the annual budget over the last six years. Unlike the substantial assistance in the *Rackin* case, this level of funding has not permitted the State to wield considerable influence over the University.[14] Likewise, the State's endowment of the University with tax exempt status has not so significantly insinuated the State into private activity or so markedly altered the ·private character of the institution that it now may be said to be performing a public function for the State.[15]

The question remains, however, whether Fourth Circuit case law requires a finding of state action solely on the basis of the private party's receipt of state financial assistance. This Court concludes that it does not. This circuit's recent state action cases and the majority of those cases from other circuits dealing with private universities in this jurisdictional context argue persuasively that funding alone cannot change the private character and activity of these educational institutions. Both the common sense logic underlying this conclusion and the onerous consequences ensuing from a contrary holding are apparent. Judge Frankel spelled out those consequences in *Grossner v. Trustees of Columbia University*, 287 F.Supp. 535 (S.D.N.Y.1968):

[R]eceipt of money from the State is not, without a good deal more, enough to make the recipient an agency or instrumentality of the Government. Otherwise all kinds of contractors and enterprises, increasingly dependent upon government business for much larger proportions of income than those here in question would find themselves charged with "state ac-

13. See, e. g., Cohen v. Illinois Institute of Technology, 524 F.2d 818 (7th Cir. 1975) (Stevens, J.), cert. denied, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976); Weise v. Syracuse Univ., 522 F.2d 397 (2d Cir. 1975); Grossner v. Trustees of Columbia Univ., 287 F.Supp. 535 (S.D. N.Y.1968).

14. See Cohen v. Illinois Institute of Technology, 524 F.2d 818 & n.18 (7th Cir. 1975), cert. denied, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976).

15. See Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

tion" in the performance of all kinds of functions we still consider and treat as essentially "private" . . ..

*Id.* at 547–48.

■ Therefore, in agreement with the vast majority of opinions on this question and with concern that the consequences outlined by Judge Frankel be avoided, this Court holds that, even if a close nexus is not a prerequisite to a finding of state action, Johns Hopkins University's receipt of financial assistance and a tax exempt status from the State of Maryland does not provide a sufficient basis for § 1983 jurisdiction in this case.

■ Furthermore, this Court believes that the time has come for the Fourth Circuit to make a definitive ruling in this area of the law. Although *Simkins* formerly represented one of the leading opinions on the state action question, the stream of judicial thought on § 1983 jurisdiction has moved in the opposite direction. The Supreme Court and many of the circuit courts have developed stricter threshold standards that have precluded the finding of state action in factual situations that are not easily distinguishable from the receipt of Hill-Burton funds in *Simkins* and its progeny.[16] Although the Supreme Court has not specifically stated that satisfaction of the close nexus theory is a mandatory prerequisite to state action, its movement from a finding of state action in *Burton* to its rejection of § 1983 jurisdiction in *Moose Lodge* and *Jackson* is most reasonably interpreted as requiring that some measure of direct involvement, affirmative support, or express approval of the alleged discriminatory policy or activity now be present. Moreover, the majority of the circuit courts that have ruled on the issue have reached this same conclusion, not only in the context of hospitals receiving Hill-Burton funds but also in situations involving private universities and other private institutions. Therefore, in the absence of settled law in this Circuit, this Court alternatively holds that

state action cannot be found in this case since the State's funding of Johns Hopkins University did not directly involve it with the alleged discriminatory activity.

### D. § 1985 Claim.

■ Plaintiff originally brought his § 1985 claim against the Johns Hopkins University. Because of the longstanding legal principle that a corporation, such as the University, cannot be held to have conspired with its own employees when they have acted for the corporation, *see e. g., Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953); *Burch v. Snider*, 461 F.Supp. 598, 601 (D.Md.1978), the Court directed the plaintiff to amend his complaint to include the director of the State Employment Security Administration as a defendant and to set out the facts supporting his conspiracy allegation against the University and the ESA. Besides the plaintiff's erroneous pleading of ESA itself rather than its director, an examination of that amendment reveals little more, in a legal sense, than the conclusory allegation that the two defendants conspired together to deny the plaintiff unemployment compensation benefits by characterizing the reason for his termination as gross misconduct rather than simply misconduct. It is well settled that conclusory allegations lacking factual specificity are insufficient to state a cause of action under § 1985. *See Pitt v. Coxe*, 65 F.R.D. 355, 356 (E.D.Pa.1975); *Wetherington v. Phillips*, 380 F.Supp. 426, 428 (E.D.N.C. 1974), *aff'd mem.*, 526 F.2d 591 (4th Cir. 1975). Furthermore, the plaintiff's allegation fails to reveal any class-based invidiously discriminatory motivation on the part of either defendant in the denial of compensation benefits. *See Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir. 1972). In view of the plaintiff's failure to properly allege a con-

---

**16.** *See, e. g., Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Ascherman v. Presbyterian Hosp. of*

*Pacific Medical Center, Inc.*, 507 F.2d 1103 (9th Cir. 1974).

spiracy under § 1985 after several attempts, the Court concludes that plaintiff's § 1985 claim must be dismissed with prejudice as to all defendants.

### E. Title VII Claim.

 In his last amended complaint, the plaintiff alleged a violation of 42 U.S.C. § 2000e *et seq.* This claim must be dismissed for two reasons. First, the plaintiff has failed to set forth facts in his complaint as amended that show he has satisfied the jurisdictional prerequisites of a Title VII suit. Secondly, the Employment Security Administration, a state agency, cannot be sued under Title VII for its decision to deny the plaintiff unemployment compensation benefits. In *Vick v. Texas Employment Commission*, 514 F.2d 734 (5th Cir. 1975), the plaintiff attempted to bring a Title VII claim under a similar theory. In that case, the Fifth Circuit ruled that the denial of unemployment benefits does not come within the meaning of the relevant statutory phrase, "or otherwise to discriminate," (42 U.S.C. § 2000e–2(b)), because there is no hint in the statutory language that such a denial of benefits is covered by Title VII. *Id.* at 736. Therefore, the Court dismisses the plaintiff's Title VII claim as improperly brought against all the defendants because of his failure to satisfy jurisdictional prerequisites and improvidently brought against the ESA because his claim is not cognizable under the language of the statute.

### Conclusion

Plaintiff brought claims under the Fair Labor Standards Act, 29 U.S.C. § 214(b)(4)(A), and the Civil Rights Statutes, 42 U.S.C. §§ 1981, 1983, 1985, and 2000e *et seq.* Defendants have filed motions to dismiss, some of which request summary judgment as alternative relief. The Court will consider all motions filed by Johns Hopkins University as having been filed on behalf of both the University and Robert J. Schuerholz, who was named as defendant in plaintiff's amended complaint, filed November 16, 1978. (*See infra* pp.

190–191). The Court has resolved the claims in the following manner:

(1) Fair Labor Standards Act claim, 29 U.S.C. § 214(b)(4)(A) dismissed for failure to state a claim cognizable under that statute.

(2) Summary Judgment granted for defendants Johns Hopkins University and Robert J. Schuerholz on the 42 U.S.C. § 1981 claim.

(3) Summary Judgment denied plaintiff on the 42 U.S.C. § 1981 claim.

(4) 42 U.S.C. § 1983 claim dismissed with prejudice as to all defendants for want of state action.

(5) 42 U.S.C. § 1985 claim dismissed with prejudice as to all defendants for failure to state a claim cognizable under that section of the Civil Rights Statute.

(6) Title VII claim (42 U.S.C. § 2000e *et seq.*) dismissed as to all defendants for failure to satisfy jurisdictional prerequisites, and, as an additional ground with respect to the ESA, for failure to state a claim cognizable under Title VII.

(7) Plaintiff's request for injunctive relief filed November 16, 1978, denied.