**T & S SERVICE ASSOCIATES, INC. and Robert L. Thomas, Plaintiffs,**

v.

**John CRENSON et al., Defendants.**

**Civ. A. No. 77–0538.**

United States District Court, D. Rhode Island.

Jan. 14, 1981.

Walter Stone, Stone, Clifton & Clifton, Providence, R. I., for plaintiffs.

Michael P. DeFanti, Hinckley, Allen, Salisbury & Parsons, Providence, R. I., for defendants.

## OPINION

FRANCIS J. BOYLE, District Judge.

This action for money damages is premised upon the asserted racial discrimination of the Barrington School Committee of the Town of Barrington, Rhode Island, in the awarding of federally funded Type A school lunch contracts.[1] It is a broad attack brought pursuant to the equal protection and due process clauses of the United States Constitution, 42 U.S.C. § 1981, 42 U.S.C. § 1983 and 42 U.S.C. § 2000d. Jurisdiction is asserted under the provisions of 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3) and (4).

The Plaintiffs in this action are T & S Service Associates, Inc. [hereinafter T & S], a Rhode Island corporation with a principal place of business in Providence, Rhode Island, and Robert L. Thomas, a black Rhode Island citizen and sole owner of T & S.

T & S is engaged in the business of preparation and service of food.

The Defendants are the Barrington School Committee, [hereinafter Committee][2] and William J. Wert, in his capacity as Barrington School Superintendent.

## FACTUAL BACKGROUND

Prior to July 1, 1977, the State Food Services Program provided meals in the Barrington Public Schools. The State Department of Education operated and staffed this program, requiring only bookkeeping services of local authorities. Contemplating a change from the State Food Services Program to that of an independent vendor, Dr. Aaron F. DeMoranville, Assistant Superintendent of the Barrington Public Schools, in July, 1976, sought information concerning both procedures and specifications for contracting with private vendors of food service. At that time Plaintiff Thomas and other representatives of T & S met with Dr. DeMoranville to assess the needs of the Barrington School System in the event of such a change. T & S provided Dr. DeMoranville with copies of contracts under which T & S was presently providing food services in other Rhode Island schools. Thereafter Nancy Ronci, operations manager of T & S, spoke with Dr. DeMoranville several times with respect to foods services contracts, and representatives of T & S, including Mr. Thomas, twice visited the Barrington schools.

Three members of the Committee, forming a subcommittee, also made on site inspections of at least three, and possibly four, of the five ultimate bidders.[3] The subcommittee did not visit the operation site of T & S.

In June, 1977, the School Committee voted to withdraw from the State Food Service Program. On July 1, 1977, the Barrington School Department, through the office of Dr. DeMoranville, solicited bids from independent vendors for the preparation, delivery and services of Type A lunches.[4] The

1. The United States Department of Agriculture, Food and Nutrition Service, promulgated regulations to effectuate the policies and mandates of the National School Lunch Act, 42 U.S.C. § 1751 et seq. Found in 7 C.F.R. § 210, these regulations specify, among other items, requirements for Type A lunches. 7 C.F.R. § 210.10. Minimum amounts of particular food components are delineated therein. Id.

2. John Crenson, Carol Fain, Elizabeth Gerhardt, Virginia Newhall and Ralph N. Swenson, Jr., in their respective capacities as members of the Barrington School Committee, were named as Defendants in the Complaint.

3. Dr. Wert and Mr. Crenson testified that the subcommittee had visited the on site operations of the other four bidders; Dr. DeMoranville testified that only three visits were made.

4. The regulations of the Department of Agriculture established procurement standards for use by State agencies in obtaining supplies, equipment and other services with Federal grant funds. 7 C.F.R. § 210.19a (1975). Part 210.-19a(h) states that "[p]ositive efforts shall be made by the State agency to utilize small business and minority-owned business sources of supplies and services. 7 C.F.R. § 210.19a(h) (1975). This Court need not, and will not, address the applicability of these regulations to local school committees in 1977. It must be noted, however, that this regulation now applies to a School Food Authority which would include a school committee. See 7 C.F.R. §§ 210.2(P) and 2.10.19a(h) (1979).

bid invitation established the requirements of a responsive bid.[5] On July 29, 1977, five food service vendors submitted bids to the Barrington School Department.

There was some apparent confusion as to what type of bid was specified in the invitation.[6] Of the five bids that were submitted, four were profit and loss bids.[7] T & S submitted the lowest profit and loss bid with a bid price of seventy cents per meal which incorporated all costs of preparing and serving the meals, including management costs. The fifth vendor, Servomation Corporation, submitted what it termed "a management fee" bid which projected a cost of fifty-seven and one-half cents per meal at the elementary level and sixty-two and one-half cents at the secondary level.[8] It should be noted at this juncture, however, that the figures quoted in the Servomation bid did not reflect the total costs per meal, in that they did not include federal and state reimbursement subsidies. Upon adding the reimbursement subsidies to the quoted prices, it is clear that the costs per meal would exceed seventy cents. On July 29, 1977, the five bids were opened in the presence of the representatives of the five bidders. The price per meal contained in each bid was announced.[9] Dr. William Wert and Dr. DeMoranville then privately analyzed the bids for the asserted purpose of comparing them to the specifications as established in the bid invitation. Dr. Wert forwarded three of the bids to the Committee and recommended that the Committee

award the contract to Servomation. The T & S bid was not forwarded to the Committee. In a memorandum to the Committee which accompanied those three bids, Dr. Wert stated that the T & S bid was deficient in five areas, to be discussed *infra*.

After the opening of the bids, but prior to the final award by the Committee, several of the bidders, including T & S, called Dr. Wert and expressed concern over the unusually low per meal costs figure submitted by Servomation. After Committee members also expressed concern about that figure, the Committee solicited further information from Servomation. On or about August 4, 1977, however, the Committee decided to follow Dr. Wert's recommendation and awarded the contract to Servomation. The Committee had not seen and, therefore, had not considered the T & S bid at any time.

Seeking to enjoin the performance of the Barrington-Servomation contract, T & S brought suit in the Superior Court, State of Rhode Island. In that proceeding, T & S alleged that the Committee was legally obligated to award the bid to T & S as the lowest bidder. On August 12, 1977, the Superior Court denied relief stating, in essence, that the plaintiffs had failed to demonstrate both irreparable harm and bad faith on the part of Barrington officials in awarding the contract. In the interim, the Committee decided to shorten the Servomation contract from three years to one year

---

5. The Barrington bid specifications asked for such information as bidder qualifications, certificates of insurance, contract length, employee requirements, salary schedules, fringe benefits and method of food preparation (Plaintiff's Exhibit 2).

6. Dr. Wert testified that the bid invitation called for both a management fee type contract and a profit and loss type contract.

7. Essentially, a profit and loss bid provides that the vendor bear all expenses incurred in providing meals for a fixed contract price. In turn, the vendor receives all revenues paid by the students and all government subsidies. The vendor's profit under this type of contract is uncertain, depending upon such matters as fluctuating food prices.

In early 1977, the USDA determined that profit and loss contracts were not in accord with the legislative requirements of the National School Lunch Act in that they failed the nonprofit test. (Defendant's Exhibit B). Dr. DeMoranville testified that the State Department of Education had advised him to request a management fee provision in the bid specifications.

8. In contrast to a profit and loss bid, a management fee bid typically provides that the school system bear all expenses in providing meals and guarantees the vendor a fixed management fee per meal.

9. The .575 and .625 figures were announced as the cost per meal in the Servomation bid.

so that the contract could be rebid the following year.[10]

After hearing in the State court proceedings the Plaintiffs sought a preliminary injunction in this Court, alleging that the Defendants had denied them the three year contract on the basis of racial discrimination. This Court denied that relief because a controversy on the same subject matter was pending in the State court. (Order, September 15, 1977). Thereafter, the State court action was withdrawn and the Plaintiffs filed an amended complaint seeking monetary damages in which the Plaintiffs asserted that the Defendants had discriminated against T & S throughout the entire bidding process because of the minority participation of T & S.

## LAW

Plaintiffs contend that the Defendants have violated the equal protection and due process clauses of the United States Constitution, 42 U.S.C. § 1981, 42 U.S.C. § 1983 and 42 U.S.C. § 2000d. Each of these alleged violations will not be discussed in this Opinion. The discussion in the decision will be confined to 42 U.S.C. § 1981 because that statute is determinative of the issues.

Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. Section 1981 is based upon the Thirteenth Amendment to the United States Constitution. *Lewis v. Bethlehem Steel Corp.*, 440 F.Supp. 949, 964 (D.Md.1977); *Gourdine v. Ellis*, 435 F.Supp. 882, 885 (D.S.C.1977). As originally designed in 1866, it was intended to abolish slavery and to eradicate its badges and incidents. *Long v. Ford Motor Co.*, 496 F.2d 500, 504 (6th Cir. 1974). *See also Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 422, 88 S.Ct. 2186, 2194, 20 L.Ed.2d 1189 (1968). "The purpose for which the Section was enacted—to afford equal opportunities to secure the benefits of American Life regardless of race—requires that a court adopt a broad outlook in enforcing Section 1981. Schemes whether blatant or subtle, are forbidden." *Long v. Ford Motor Co., supra,* at 505. On its face, Section 1981 relates particularly to the making and enforcement of contracts. *Johnson v. Railway Express Agency*, 421 U.S. 454, 459, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975). Nonetheless, Section 1981 is not an affirmative action mandate. It is, instead, an equalizing provision designed to ensure that rights—primarily contractual rights—do not vary according to race. *Greene v. Johns Hopkins University*, 469 F.Supp. 187, 193 (D.Md.1979); *see Long v. Ford Motor Co., supra,* at 505.

To state a cause of action under § 1981 the plaintiff must assert a deprivation of rights which, under analogous circumstances, would have been accorded to a person of a different race. *Greene v. Johns Hopkins University, supra,* at 193. In this action, therefore, the Plaintiffs have properly alleged that because of their race Defendants treated them differently than other vendors involved in the bidding process.[11] Before addressing the merits of this

---

**10.** In his decision the Superior Court Justice stated that Barrington, having recognized that it had made a mistake, would reissue the bid specifications and seek bids the following year. In fact, counsel for the Defendants has informed the Court that the Servomation contract was cancelled by agreement of the parties in December, 1977, because of cost overruns. Barrington returned to the State lunch program in 1978.

**11.** Clearly, the Plaintiffs must allege a denial of the opportunity to contract with the Defendants because of race in order to state a cause of action under Section 1981. *See Krohn v. Harvard Law School*, 552 F.2d 21 (1st Cir. 1977) (dismissing the Plaintiffs' § 1981 claim); *Scott v. Clark*, 436 F.Supp. 569, 571–72 (E.D.Mo. 1977) (discussing failure of plaintiff to claim rejection of proposal due to race).

action, however, it is necessary to first consider the issue of standing.

There are two Plaintiffs in this action. As such, each plaintiff must satisfy the requirements of standing. It is clear that T & S has satisfied the Article III standing requirements as set forth in *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975), and statutory standing under Section 1981. *See Des Vergnes v. Seekonk Water District*, 601 F.2d 9, 14 (1st Cir. 1979). In contrast, Robert L. Thomas, the sole stockholder of T & S lacks standing in the instant case. As noted by the First Circuit Court in *Des Vergnes*, "[t]he personal insolvency of and loss of future earning power of [the stockholder] ... do not give ... [the sole shareholder] a constitutional or statutory standing to sue ...." *Des Vergnes v. Seekonk Water District, supra*, at 16. As such, whether or not the individual Plaintiff Thomas was to provide personal services as operations supervisor for the lunch program is irrelevant to the issue of standing.

Like the complainant in a Title VII action, Plaintiff T & S has the initial burden of establishing a *prima facie* case of racial discrimination. *See Sabol v. Snyder*, 524 F.2d 1009, 1012 (10th Cir. 1975); *Williams v. Interstate Motor Freight Systems, supra*, at 25. Accordingly, the test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) is applicable to this § 1981 claim. Thus, to establish a *prima facie* case T & S must show: (1) that it belongs to a racial minority; (2) that it applied and was qualified to perform the contract; (3) that despite being qualified it was rejected and (4) that, after the rejection, the position remained open and Barrington continued to seek applicants from food service contractors of T & S's qualifications. *McDonnell Douglas Corp. v. Green, supra*, at 802, 93 S.Ct. at 1824.

Plaintiff T & S is a minority-owned business; the sole stockholder, Robert L. Thomas, is black. Secondly, in accord with bid specifications, T & S demonstrated that it was qualified to perform the contract. In the bid itself, T & S provided evidence of financial capability to perform, listed other contracts with school systems which had been or were in the process of being performed by T & S, including Warwick and Narragansett, Rhode Island and nearby Fall River, Massachusetts, stated that Mr. Thomas had twenty-five years of food service experience and provided a statement concerning Mr. Thomas' capabilities as on-site supervisory personnel. Thirdly, the Committee never saw the T & S bid because Dr. Wert did not forward the bid to the Committee. Rather, in a memorandum to the Committee, Dr. Wert stated that the T & S bid did not meet bid specifications because it did not contain: 1) two entree choices at the elementary level; 2) a detailed analysis of employee benefits and program benefits; 3) a residential manager program according to bid specifications; 4) a guarantee of employment of existing personnel; and 5) a detailed analysis of foods to be served. A comparison of the T & S bid to the Barrington specifications, however, reveals little basis for these assertions. The sample menu submitted by T & S provided for two daily choices: a Type A Lunch or a "basket lunch." The contents of the basket lunches, which also satisfy Type A lunch requirements, were set out in detail in the bid. The T & S bid provided for life insurance and Blue Cross coverage for all employees who worked over twenty hours per week. The T & S bid specifically provided that Robert Thomas would work as an on-site supervisor. Moreover, the T & S bid stated that all employees presently working in the Barrington system would be given first preference for all nonmanagement positions. Finally, the T & S bid unquestionably provided a detailed analysis of foods to be served, especially with regard to the basket lunches.

The fourth and final requirement of the *McDonnell Douglas* test is satisfied in that the Committee awarded the contract to Servomation several weeks after Dr. Wert had rejected the T & S bid. Furthermore, Mr. Crenson, Chairman of the Barrington School Committee, testified that he and

other members of the Committee, as well as other bidders, were so concerned about the abnormally low price per meal figure that the Committee requested additional information about the bid. That information and, presumably, the closer examination of the Servomation bid which followed, should have revealed to the Committee that it had misperceived the true cost per meal figure as represented in the Servomation bid. Nonetheless, even after a second look at the Servomation bid, the T & S bid was not even considered by the Committee. T & S, therefore, has clearly satisfied the *McDonnell Douglas* test.

In addition to the *McDonnell Douglas* test, T & S must establish a *prima facie* case of discriminatory purpose. *Williams v. DeKalb County*, 582 F.2d 2, 3 (5th Cir. 1978) (*per curiam*). *Cf. Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). While discriminatory purpose must necessarily be inferred, the evidence before this Court is capable of such inferences.

Dr. DeMoranville, the Assistant Superintendent, testified that he had met with Mr. Thomas and other T & S representatives in July, 1976. Testimony was also given that T & S representatives were in frequent contact with Dr. DeMoranville's office during the following year. The Superintendent, Dr. Wert, and the Chairman of the Committee, Mr. Crenson, testified, on the other hand, that they had no knowledge of the minority status of T & S until after the contract had been awarded. It is simply inconceivable, however, that Dr. DeMoranville would not have told Dr. Wert or Mr. Crenson or other members of the School Committee that Mr. Thomas is black at some time during that year before the award of the contract.

Another inference of racial discrimination is raised because the Committee did not visit the operations site of T & S, and it did visit the sites of at least three of the five ultimate bidders. This inference is well supported by the fact that T & S operated locally. Dr. Wert testified that he had no reason to make an on-site inspection because he had no personal knowledge of or contact with the company. Again, it is simply unbelievable that Dr. Wert would have no knowledge of T & S and its interest in bidding for the contract, especially in light of the fact that T & S had supplied Dr. DeMoranville with sample contracts and had been in frequent contact with him.

Finally, as noted above, this Court finds little support for Dr. Wert's rejection of T & S's bid, admittedly recognized at the outset as the lowest profit and loss bid. Moreover, Mr. Crenson testified that Dr. Wert had forwarded another bid which did not meet specifications, and which was automatically excluded by the Committee, because the company had bid for a one year contract instead of the required three year contract. That action by Dr. Wert intimates that noncompliance with bid specifications was not necessarily fatal to all bids at Dr. Wert's step in the bidding process.

■ Once T & S has established a *prima facie* case of race discrimination and it has so demonstrated, the burden of proof shifts to the Defendants to articulate some legitimate, nondiscriminatory reason for the rejection of Plaintiff's bid. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802, 93 S.Ct. at 1824; *Sabol v. Snyder, supra,* at 1012. In this regard the Defendants have asserted that it awarded the contract to Servomation because it believed that Servomation had met all of the bid specifications, unlike T & S. Secondly, the Defendants contend that award of the contract to Servomation was based on a mistaken belief that Servomation was low bidder. Finally, the Defendants argue that those errors were good faith errors resulting from ignorance of private food service contracts and applicable regulations. Those arguments are not persuasive. Even assuming the assertions made in Dr. Wert's Memorandum to be legitimate and nondiscriminatory reasons, they are reasons articulated by Defendant Wert only, and not adopted by the Defendant Committee which did not consider the T & S bid at all. Moreover, these reasons are pretextual, as discussed *supra.* Secondly, the Committee had taken a second look at the Servomation bid. After

that subsequent analysis, it should have been clear to the Committee, by virtue of the bid itself, that something was amiss with the Servomation bid figure, and that because of the nature of the bid, the figure did not reflect total costs per meal. At that point in the bidding process, the Committee could certainly have ascertained that T & S was, in fact, the lowest bidder.

■ The Committee's assertion of good faith based on ignorance of the private food service contracts and applicable regulations has little merit. Although it is believable that the Committee had initially erred in good faith in issuing a bid invitation which called for both profit and loss and management fee type contracts, the Committee subsequently failed to rectify its error and the consequences of that error once it became obvious. That failure, like the failure of Committee members to make an on-site visit to T & S, bespeaks only of bad faith. Moreover, because the Committee has asserted that its primary reason for contracting with Servomation was the mistaken belief that Servomation was the low bidder, ignorance of applicable regulations would have little bearing on the issue of good faith. Thus, although Dr. DeMoranville testified that he had included a management fee provision on the advice of the Department of Education, neither Dr. Wert nor the Committee have asserted that the fact that the Servomation bid was a management fee bid determined the award of the contract. It is clear, furthermore, that the nature of the bids, and knowledge or lack of knowledge of applicable regulations, had little if any bearing on the decision not to forward the T & S bid to the Committee.

Thus, the Defendants have failed to articulate a legitimate nondiscriminatory reason for the rejection of the Plaintiff's bid. Plaintiff T & S must prevail.

## DAMAGES

■ Satisfying its burden of proof, Plaintiff T & S has demonstrated by a preponderance of the evidence that the Defendants have violated the Plaintiff corporation's civil rights in the contravention of 42 U.S.C. § 1981. One who establishes a cause of action under § 1981 is entitled to compensatory damages and, under particular circumstances, punitive damages. *Johnson v. Railway Express Agency, supra,* 421 U.S. at 459–60, 95 S.Ct. at 1719. "The purpose of damages is to put the plaintiff in the same position, so far as money can do it, as he would have been had there been no injury or breach of duty, that is, to compensate him for the injury actually sustained." *Lee v. Southern Home Sites Corporation,* 429 F.2d 290, 293 (5th Cir. 1970). Thus, back pay awards are made in § 1981 cases to restore those discriminated against to the position in which they would be were it not for the discrimination. *Flores v. Local 25,* 407 F.Supp. 218, 221 (E.D.N.Y.1976); *see, e. g., Faraca v. Clements,* 506 F.2d 956, 959 (5th Cir.), *cert. denied,* 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1975); *Waters v. Wisconsin Steel Works of International Harvester Co.,* 502 F.2d 1309, 1321 (7th Cir. 1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976).

■ In the instant case, therefore, T & S is entitled to compensatory damages for the injury actually sustained. T & S has shown with a reasonable degree of certainty that its profit from the Barrington contract would have been $22,787. As a result of the Committee's discriminatory practices in not awarding the contract to T & S, T & S suffered a loss in the amount of $22,787. Thus, Plaintiff T & S is entitled to that amount in compensatory damages.

■ As noted above, punitive damages are sometimes appropriate when the plaintiff has established a violation of Section 1981. Under Rhode Island law, however, the plaintiff seeking punitive damages must demonstrate that the defendant has acted with "malice, wantonness or wilfulness ... of [such] an extreme nature ... as amounting to 'criminality, which for the good of society and warning to the individual, ought to be punished.'" *Holmes v. Bateson,* 434 F.Supp. 1365, 1390 (D.R.I. 1977), *aff'd in part (rev'd in part on other grounds),* 583 F.2d 542 (1st Cir. 1978) (quot-

ing *Adams v. Lorraine Manufacturing Co.*, 29 R.I. 333, 338, 71 A. 180 (1908)). That degree of malice does not exist in this case. Thus, while malice may be inferred in this case, particularly with respect to the actions of Dr. Wert, specific evidence of malice to satisfy the *Holmes* test was not presented here. Consequently, punitive damages are inappropriate in this action.

The Defendant Committee, therefore, is liable to the Plaintiff T & S for compensatory damages because the Committee structured the bidding process in such a way that allowed pervasive racial discrimination against T & S. Dr. Wert, the chief administrative agent of the Committee pursuant to R.I.Gen.Laws § 16–2–11, is also liable to the Plaintiff T & S for compensatory damages.[12] *See Tillman v. Wheaton-Haven Recreation Association, Inc.*, 517 F.2d 1141, 1143–44 (4th Cir. 1975); *Coley v. M & M Mars, Inc.*, 461 F.Supp. 1073, 1076 (M.D.Ga. 1978). The Plaintiff corporation has failed to prove that either of the Defendants possessed the requisite malice for an award of punitive damages.

Plaintiffs will prepare and present a form of judgment against Defendant School Committee and Defendant William J. Wert each in the amount of $22,787, plus interests and costs and a form of judgment dismissing the action of Plaintiff Robert L. Thomas against both Defendants. Plaintiff corporation is entitled to two monetary judgments, but in no event to total satisfaction of more than $22,787, plus interests and costs from either or both Defendants. *Cf. Washington Trust Co. v. Fatone*, 106 R.I. 168, 172, 256 A.2d 490 (1969).

SO ORDERED.

---

12. Section 16–2–11 of the Rhode Island General Laws provides in pertinent part: "The superintendent of schools ... shall, under the direction of the school committee, ... be the chief administrative agent of the school committee." R.I.Gen.Laws § 16–2–11 (1970).