Norbert L. **CODY,** Luther **Boykins,** John **Edwards,** Frank L. **Shannon,** James **Woods,** James Howard **Cody,** Bruce **Haskins,** Willie **Smith,** Clyde **Mason** and Frederick **Lewis, Individually and as members of the Class, Plaintiffs,**

v.

**UNION ELECTRIC COMPANY, a Missouri Corporation, Defendant.**

No. 74–736C(1).

United States District Court, E. D. Missouri, E. D.

Dec. 10, 1980.

Doris Gregory Black, St. Louis, Mo., for the class.

Henry Thomas, St. Louis, Mo., for Norbert L. Cody.

Francis X. Duda, St. Louis, Mo., for defendant.

## MEMORANDUM

WANGELIN, Chief Judge.

This matter is before the Court for a decision on the merits following a bench trial that involved the taking of evidence at various times over a period of thirteen (13) full days in late 1978 and early 1979. Plaintiffs bring this class action Civil Rights suit challenging defendant's commercial security deposit policy and defendant's credit practices and procedures, alleging violations of 42 U.S.C. § 1981 and the Thirteenth and Fourteenth Amendments.

After consideration of the testimony adduced at trial, the exhibits introduced in evidence, the briefs of the parties, and the applicable law, the Court hereby makes and enters the following findings of fact and conclusions of law. Any finding of fact equally applicable as a conclusion of law is hereby adopted as such and, conversely, any conclusion of law applicable as a finding of fact is adopted as such.

### Findings of Fact

1. Defendant Union Electric Company is a Missouri public utility which provides electricity to both private and commercial customers. Before the commencement of service to a commercial customer, Union Electric Company requires all new commercial customers to pay a cash security deposit unless the customer can establish a satisfactory credit history with the company or otherwise demonstrate credit worthiness.

2. Union Electric's commercial security deposit policy is authorized by the Rules and Regulations of the Missouri Public Service Commission—General Order No. 20, Rule 12. This Rule was originally filed as a part of the Company's tariff on July 31, 1959, and refiled on July 12, 1978; the Rule was most recently approved again by the Missouri Public Service Commission on July 19, 1978.

3. The challenged security deposit policy provides inter alia that Union Electric may at any time as a condition to furnishing or continuing service require any commercial customer to make a cash deposit or at the Company's option furnish a personal guarantee, bond or bank letter of credit. The deposit or guarantee shall not exceed an estimated bill covering one billing period plus thirty (30) days. Any cash deposit held by the Company for six months or longer shall accrue simple interest at the rate of

six per cent (6%) per annum from the day the deposit was lodged with the utility. The deposit shall be retained by Union Electric as a surety until either the customer establishes, in the opinion of the company, satisfactory credit or the commercial customer's account is closed at which time the Company shall refund to the customer the amount of the deposit as well as interest accrued, after subtracting any indebtedness of the customer to the Company.

4. Union Electric determines the amount of security deposit required before commencement of service by reviewing the record of electric usage at the particular business address, selecting the highest bill in the past twelve month period and doubling this amount. This is a proper approximation of the amount under guidelines set forth in Section VIII of the General Rules and Regulations of the Missouri Public Service Commission. If no prior record of the electric usage for the business is available, a Company sales representative estimates the annual revenue for the particular business account and Union Electric credit personnel use this estimated annual revenue figure to determine the probable amount of usage for two months to arrive at the deposit amount. There are also occasions when credit personnel determine that these general indications are not a valid measurement of electricity usage for that particular type of business. Such estimations are based upon the credit personnel's general knowledge and experience in determining a business's potential electricity usage.

5. Since at least 1959 Union Electric has required all of its commercial customers to pay a cash security deposit, calculated according to the guidelines approved by the Missouri Public Service Commission, unless the customer could establish a satisfactory business credit history with the Company or in some other manner establish a good credit rating. A customer's prior untimely payment of bills or the forwarding of bad checks are among the factors which may indicate the quality of the customer's credit risk at a new account he has opened. Similarly, a poor credit record influences when, if ever, a customer is entitled to a refund of all or part of his security deposit prior to the closing of an account.

6. The customer may petition the utility for a reassessment of the electric usage estimation if he feels that it is not an accurate computation. Such a request is readily received by the Company and the utility company may adjust the required deposit downward. However, the utility is the final arbiter of the accuracy of the deposit estimation.

7. If the utility is unable to make an accurate estimation of the electricity usage for that particular business address, it will charge a minimum of $50.00 as a security deposit. This assessment is made when the Company is unable to determine the previous usage history of the meter at the particular business address.

8. The security deposit charge is a reasonable economic measure employed solely to ensure a minimal number of uncollectible bills. This policy has saved Union Electric $48,000 in a fiscal year dating from September, 1977 to September, 1978.

9. The commercial security deposit is reviewed after three years for a determination of the worthiness of a refund. If the credit history of the business is satisfactory the deposit is then automatically refunded with interest. Prior to June 29, 1977, refunds of deposits were determined by an individual review of the business customer's account history.

10. Credit department personnel who make a decision on the amount of deposit to be required by a business take into account whether the applicant has ever had a commercial account with the Company and the address of that account. If a prior commercial account with the Company can be identified this information is reviewed to make an assessment of this applicant's prior payment history. Such factors as prior delinquent or nonexistent payment histories play a significant role in the credit department's assessment of the desirability of a deposit and its amount.

11. New service applications are taken by adjusters of the customer business de-

partment over the telephone or at the customer service office. These adjusters make the background determination of whether an applicant has ever had a commercial account with the Company and, if so, the address of that account.

12. Both the credit department and the customer service office are staffed with black as well as white employees. Three of the nine credit persons employed by Union Electric are charged with the responsibility of implementing the deposit policy. One of four senior credit persons is black.

13. The racial identity of the potential customer is not noted on the Company's records. The racial identity of the potential customer is in no way a factor in the decision of Union Electric to demand a security deposit nor is it a factor in the determination of the amount of deposit requested. This factual determination is evidenced by testimony of a black woman who is the Company's supervisor of the customer service for the 12th Street office in St. Louis, the testimony of a senior credit person who is a black, full-time employee in the credit department, and the testimony of two black credit persons who are responsible for making security deposit decisions.

14. Since Union Electric's records do not disclose the racial identity of the commercial customer, the number of black commercial customers in the City of St. Louis who are required to lodge a security deposit is unknown. Neither the geographic location of the commercial business, the zip code, nor knowledge of the customer's race, in any way play a factor in the decision of Union Electric to require a security deposit or to dictate the amount of the deposit if such is required.

15. Plaintiff Luther Boykins is a black businessman who had five separate commercial accounts with Union Electric. An account at 4135 Shreve, St. Louis, Missouri, with a service period of "unknown to 5-7-69" required a deposit of $400.00. The method of calculation for this deposit cannot be verified because records are only available to December 5, 1971. This deposit, plus interest, was applied to a final outstanding bill of $45.66, and a $354.34 refund was sent to the parties listed on the account. A second account at 4135 Shreve, from May 7, 1969 to August 8, 1972, also required a $400.00 deposit. The calculation of this deposit amount cannot be verified because records again were only available beginning December 5, 1971. A third account at 4135 Shreve was set up from August 8, 1972 to November 16, 1972. A $540.00 deposit was authorized. The amount of the deposit was calculated by noting the amount of a bill from a previous account at the same address from June 30, 1972 to August 1, 1972. This amount computes to $276.04 which multiplied by 2 totals $552.08. This $540.00 security deposit was never forwarded by Mr. Boykins although the Company requested its payment. An account at 4122 Shreve, from January 3, 1969 to the time of trial, reveals that no deposit was required. A fifth commercial account by Mr. Boykins at 3706 Shreve, from August 10, 1964 to June 14, 1972, required a $36.00 deposit. The method of calculation of this amount cannot be verified because records are only available to July 6, 1972. When this account was closed Mr. Boykins had an outstanding bill of $18.18. On October 28, 1969 the deposit plus interest ($47.10) was refunded to the customer. The $18.18 balance on this account was charged off as uncollectible on November 16, 1972.

16. Plaintiff Norbert L. Cody is a black businessman who had several commercial accounts with Union Electric. The first account at 1346 Leffingwell, had a service period from September 1, 1970 to April 4, 1972. Union Electric required a deposit of $60.00 which was paid by Mr. Cody on March 31, 1971. The account was closed on April 4, 1972 and the deposit plus interest of $3.64 was refunded to the customer on the same date. The method of calculation for this deposit cannot be verified because records are unavailable for this time period. On March 29, 1972, the account at 1346 Leffingwell was reinstated and the $50.00 deposit was requested. Mr. Cody never paid the full amount of deposit, instead

forwarding $25.00 to Union Electric on July 13, 1972. The service period of this reinstated account ran from March 29, 1972 to October 4, 1972. On the day of the close of the account (October 4, 1972) a final bill of $337.41 was outstanding. After applying the deposit ($25.00) the remaining amount due ($312.41) was paid by the customer on December 18, 1972 by means of a check. During this period of electricity usage at this reinstated account, the plaintiff Norbert L. Cody signed a promissory note on April 6, 1972 agreeing to pay the amount in arrears. Pursuant to the terms of that promissory note, Mr. Cody wrote two checks for partial payment of the amount set forth in the promissory note. Both checks were returned for insufficient funds. Based on the continuing failure of Mr. Cody to forward payment to Union Electric for electricity used, the account was disconnected on several different occasions. In response to Union Electric's disconnection of service to this commercial account, Mr. Cody ingeniously reconnected the meter. Eventually, Union Electric sent out a crew to remove the service wire in an attempt to permanently terminate service to the customer delinquent in payment of his account. Later Mr. Norbert Cody also opened another commercial account with Union Electric at 2833 Lawton Promenade on April 16, 1973. Union Electric required a $250.00 deposit as security for this account, which was paid in cash on May 30, 1973. The method of calculation of the amount of this deposit was calculated by a Mr. Ben Jones, a credit supervisor with Union Electric. Mr. Jones relied upon his experience with the type of business to estimate a deposit base of $125.00. In accordance with standard policy of Union Electric this amount was doubled to calculate the amount of security deposit required. Mr. Jones also testified that such factors as the customer's prior delinquent account and the customer's prior, numerous, unauthorized, apparently illegal, self reconnections were also factors in calculating the deposit base.[1] The account at 2833 Lawton Promenade was closed on February 1, 1974. The deposit of $250.00 plus interest in the amount of $9.10 was applied to a final bill of $174.96 and the credit balance of $84.14 was refunded to Mr. Norbert Cody on February 4, 1974. All terminations by Union Electric of Mr. Norbert Cody's account at 2833 Lawton Promenade were the result of failure to pay for electricity used. Attempts by Mr. Norbert Cody to pay outstanding balances resulted in numerous bad checks being written to the utility. For instance, on October 23, 1973, service was disconnected by Union Electric after it had received an insufficient funds check in the amount of $355.26. Union Electric also received another bad check in the amount of $79.00. No evidence in the record suggests that Mr. Norbert Cody's account was terminated for failure to pay the deposit amounts requested by the Company; instead, delinquency in payment and payment by means of bad checks were the underlying reasons for Union Electric's repeated attempts to disconnect Mr. Norbert Cody's commercial account at 2833 Lawton Promenade. Additionally, the validity of the initial security deposit amount of $255.00 at this address is born out by actual bills of Mr. Norbert Cody for electric usage.

17. James Howard Cody is a black businessman who has had numerous commercial electricity accounts with Union Electric. Mr. Cody had an account at the New Yorker Staley Hotel, 528 North Vandeventer, for a service period of unknown length. Union Electric required a $286.00 deposit and the method of calculation of this amount cannot be verified because records are not available. The deposit was paid in full in two installments by Mr. James Cody. Union Electric records show that a final bill of $452.58 was due on this account and after a

1. Initially, Mr. Norbert Cody was twice charged the security deposit of $250.00 because of a clerical error. The deposit payment was not credited to the account as a deposit, as alleged by Mr. Cody, but rather as a credit for electrical services. This clerical error was discovered by Union Electric and rectified. Subsequently, payments for electric services were credited against the electric service charges and not set off as partial payments for the mistaken second $250.00 security deposit.

set off of the deposit plus interest an outstanding balance of $152.78 was due. On July 19, 1971, Union Electric charged off this balance as uncollectible. At another account at 528 North Vandeventer, the New Yorker, Mr. James Cody was required to deposit $50.00. The method of calculation of this amount of deposit cannot be verified because records are unavailable. The service period of this account is also unknown. A final bill of $49.36 was due on this account and after the deposit plus interest was applied, $2.60 was refunded when the account was closed on March 10, 1971. A third account at 534 North Vandeventer with a service period from June 22, 1970 to October 4, 1971 required no security deposit to be lodged. A final balance due of $122.88 was written off by Union Electric on April 17, 1972 as uncollectible. Another account at 538 North Vandeventer with a service period of unknown length required a $92.00 deposit. The method of calculation of this deposit amount cannot be verified because records are unavailable. From this deposit amount the final bill in the amount of $55.15 was subtracted and on July 23, 1970, Mr. James Cody was refunded $36.85. A fifth account is listed at 2624 Palm, with a service period from September 10, 1970 to September 10, 1971. No deposit was required by Union Electric. A final bill of $72.34 was charged off by Union Electric as uncollectible on April 18, 1972. Another account at 401 N. Sara had a service period from March 30, 1976 to November 8, 1976. A deposit amount of $125.00 was required and the method of calculation was based upon the average amount of electricity used on the lower floor of the building multiplied by 2. Mr. James Cody did not pay the amount of deposit required by Union Electric, instead merely tendering $50.00 approximately three months after the deposit was requested. Upon closure of the account, $50.00 was paid to Mr. James Cody. Mr. James Cody had another account at 401 N. Sara with a service period from March 30, 1976 to August 16, 1976. The amount of deposit required was $75.00 and this amount was calculated by averaging the last ten bills of the predecessor.

This amount equaled $66.00 which when multiplied by 2 according to standard Union Electric policy would have equaled $132.00. However, only $75.00 deposit was required. A final bill of $74.65 was tendered by Union Electric and a balance of $.35 was credited to Mr. James Cody's account. Another account at 401 N. Sara with a service period from August 18, 1976 to October 18, 1977 required a deposit of $75.00. This amount was calculated by applying the original deposit amount initially requested at this location. In September of 1977 an additional deposit of $275.00 was requested by Union Electric. The method of calculation for this amount was assessed by taking the amount of one month's billing from June 10, 1977 to July 11, 1977 and multiplying by 2 and then subtracting the original amount of deposit ($75.00 requested) in January of 1977. Mr. James Cody never paid the amount requested by Union Electric, instead merely deposited a total of $175.00 in three separate payments. A final bill of $740.07 was offset by a $175.00 deposit and the balance due of $561.00 was transferred to the account at 4110 Olive. Another account by Mr. James Howard Cody at 447 N. Sara shows a service period from January 4, 1974 to December 19, 1974. A deposit amount of $350.00 was requested and the method of calculation of this amount cannot be verified because records are not available. The total amount requested by Union Electric was paid by Mr. James Cody. A final bill of $921.22 was transferred to this account which was later reinstated. The reinstated account at 447 N. Sara had a service period from December 19, 1974 to August 22, 1978. A deposit of $360.00 was required and the method of calculation is unknown. However, the deposit varies only $10.00 from that initially required at this account. A final bill of $45.71 was lodged and an amount of refund of $388.81 was paid to Mr. James Cody. Another account by Mr. James Cody was opened at 420 N. Sara from November 10, 1975 to March 30, 1976. No deposit was requested and a final bill of $127.68 was transferred to 4110 Olive. Finally, an account at 4110 Olive shows a service period from March 20, 1976 to July

14, 1978. A deposit of $70.00 was requested and the method of calculation was based upon the customer's use from March 30, 1976 to June 24, 1976 divided by 3 for the number of months calculated, and multiplied by 2 in accordance with Union Electric's approved method of calculating security deposits. A final bill of $737.84 remained outstanding. After applying a deposit of $70.00 to this outstanding bill, the balance due is $660.50 which was not paid as of November 8, 1978.

18. John Edwards is a black businessman who had five commercial accounts with Union Electric. The first account opened by Mr. Edwards was at 1234 N. Taylor for a service period of unknown length where a $50.00 deposit was required. The method of calculation of this deposit cannot be verified because records are not available. An additional deposit in the amount of $150.00 was requested by Union Electric in 1956 and the computation of this additional amount of deposit cannot be verified because records are not available. The total deposit amount of $200.00 garnered $45.95 interest and when the final bill of $164.23 was subtracted from this amount, Mr. John Edwards was forwarded the balance of $81.72 on February 17, 1960. An account was also opened at 4267 W. Finney for a service period from February 1, 1960 to September 10, 1976. An initial deposit of $50.00 was requested in January of 1960 but the method of computation of this amount cannot be verified because records are no longer available. Additional deposits of $60.00 were requested in October of 1960 and $40.00 was requested in March, 1963. The method of calculation is unknown. From a final bill of $419.84 the $150.00 in deposit as well as $116.70 in accrued interest were subtracted and the balance due was paid by Mr. Edwards on November 9, 1976. Another commercial account at 4269 W. Finney was serviced by Union Electric from October 1, 1959 to February 21, 1978. A deposit of $125.00 was required and the method of calculation for the amount of this deposit cannot be verified because records are not available. An additional deposit of $95.00 was also requested in January of 1964 and the method of computation of this amount cannot be verified. The $210.00 deposit was transferred from this address to 4267 W. Finney, along with a final bill in the amount of $57.16. The amount of deposit requested appears reasonable in light of evidence that the customer's highest utility bill from June 20, 1977 to July 20, 1977 was over $300.00. When adjusted to comport with Union Electric's standard security deposit calculation for commercial accounts, multiplied by 2, a $210.00 deposit would not appear to be out of line with that required of all customers. In addition it is noted that the customer at the account of 4267 W. Finney from a period of May 22, 1972 to February 21, 1978 was routinely behind in the payment of his outstanding balance. A fourth commercial account was opened by Mr. Edwards at 4267 W. Finney from January 14, 1977 through the date of this trial. A deposit of $300.00 was required. The method of calculation appears to have been computed by taking the amount of electric usage from May 21, 1975 to June 20, 1975 and multiplying by 2. The base amount computed to be $146.83, which when adjusted for Union Electric's standard deposit calculation, is within $7.00 of the amount requested by Union Electric. The $210.00 deposit transferred from 4267 W. Finney to this address resulted in an aggregate deposit payment at 4267 W. Finney of $510.00. However, this deposit amount substantially undervalues the amount of electricity more recently used at this address. For instance, from August 22, 1978 to September 22, 1978, this customer used electricity valued at $657.83. The total amount of deposit required including that transferred from 4269 W. Finney did not even equal the amount of electricity used for this one month. Mr. Edwards also had a commercial account at 4135 Shreve from an unknown date of commencement up to May 7, 1969. The amount of deposit required was $400.00 and the method of calculation of this amount cannot be verified because records are only available beginning November 5, 1971. A final bill of $45.66 was debited from this deposit

amount and in May of 1969 Mr. Edwards was refunded $354.34. An examination of the statements for the accounts at 4267 W. Finney and the two accounts at 4269 W. Finney indicate that Mr. Edwards frequently paid his bills late and on at least three occasions sent bad checks to Union Electric.

19. Plaintiff Bruce Haskins is a black businessman who had several commercial accounts with Union Electric. Mr. Haskins opened an account at 1507 N. Jefferson from as early as 1947 to 1955. A $20.00 deposit was required, and the method of the computation of the amount of this deposit cannot be verified because records are not available. The deposit plus interest in the amount of $10.12 was applied to a final bill in September of 1955. The account at 1507 N. Jefferson was reopened by Mr. Haskins and serviced from 1955 to 1959. The amount of deposit is unknown, although Company records show that on August 29, 1955 $60.00 was paid. This deposit plus interest of $12.96 was applied to a final bill in February of 1959. An account was opened by Mr. Haskins at 1822 Elliott for a service period from January 1, 1959 to the present. A $50.00 deposit was required and the method of the computation of this amount cannot be verified because records are not available. Interest in the amount of $32.23 accrued and this amount together with the initial deposit was refunded to Mr. Haskins on October 24, 1969 because of his good payment record. This account is presently opened and Mr. Haskins is not required to lodge a security deposit. Mr. Haskins opened an account at 2630 Glasgow for a period from September 18, 1967 to the present. A deposit of $154.00 was required and the amount of the computation cannot be verified because records are incomplete. On June 28, 1976 the initial deposit plus interest in the amount of $80.39 was refunded to Mr. Haskins because of his good payment record. This account remained open at the time of the trial and Mr. Haskins has not been required to lodge any security deposit.

20. Plaintiff Fred Lewis is a black businessman who has had several commercial accounts with Union Electric. An account at 5000 Thelka was serviced from May 9, 1973 to April 6, 1976 and a deposit of $195.00 was required. The method of calculation was based upon the amount of electricity used from April to May of 1972, which was billed at $97.75. The amount of deposit initially required at 5000 Thelka is exactly twice the cost of the amount of electricity used from April to May of 1972. An additional deposit of $105.00 was requested by Union Electric on February 25, 1975. Usage of electricity from June 27, 1974 to July 29, 1974 showed a substantial increase in billing amounts. Specifically, $150.38 worth of electrical service was provided during this period in 1974. Multiplying this amount by 2 and subtracting the initial deposit of $195.00 replicates the procedures properly used by Union Electric to arrive at the additional deposit amount. The deposit amount plus interest which accrued to $39.11 was applied to a final bill for the account of $667.51 as of April 6, 1976. The net difference of $328.40 was transferred to a commercial account at 5097 Union. An examination of the billing statement for 5000 Thelka shows that three bad checks of $104.23, $264.40 and $200.00 were forwarded to Union Electric by Fred Lewis in an attempt to retire outstanding debts. Mr. Lewis also had a commercial account at 5458 Lillian with a service period from May 10, 1973 to June 14, 1976. A deposit of $260.00 was required and the method of calculation appears to have been arrived at by doubling the cost of electric usage from July 28, 1972 to August 28, 1972. Union Electric assessed a charge of $127.54 for this time period and when multiplied by 2 this amount reflects within $5.00 the amount of deposit initially required. An additional deposit of $90.00 was requested on February 25, 1975. This increase in deposit was calculated by noting the cost of electricity used from June 27, 1974 to July 29, 1974. A fee of $175.33 was assessed for electricity used during this period. The $48.00 increase in the amount of electricity used from 1972 to 1974 when multiplied by 2 comports with the additional deposit of $90.00 required in 1975. An

examination of the billing statement for 5458 Lillian reflects that bad checks in the amounts of $118.54, $141.60, $337.43 and $312.15 were forwarded to the Company in an attempt to satisfy outstanding obligations before the time in which the additional $90.00 was required. After the time in which the additional $90.00 was requested, the customer forwarded bad checks in the amounts of $150.00, $136.25 and $149.94 to Union Electric in an attempt to satisfy outstanding debts. Another commercial account was located at 5097 Union and was serviced from May 1, 1974 to September 27, 1976. An additional deposit of $200.00 was requested by Union Electric in October of 1974. The method of calculation was based upon usage from May 1, 1974 to July 1, 1974. Electricity usage for this time period cost $203.43, $3.43 over the amount of deposit initially required. An examination of the billing statement for the account at 5097 Union shows that bad checks were received in the amounts of $300.00, $125.00 and $200.00. The total security deposits plus interest were applied to the account's final bill of $1,146.55 as of September 27, 1976. Portions of this outstanding bill resulted from outstanding amounts due from this customer but at other commercial addresses. The amount owed of $919.05 was charged off by Union Electric as uncollectible on March 16, 1977.

21. Plaintiff Clyde Mason is a black businessman who had a commercial account at 1311 North Grand. The service period was from January 11, 1973 to April 1, 1975. The deposit requested by Union Electric amounted to $725.00. This amount was calculated by noting the cost of electricity used from December 13, 1971 to January 12, 1972 by a prior customer at this account. The bill for this period of time equaled $361.42, and when multiplied by 2 according to standard Union Electric practice equaled $722.84. A final bill of $488.59 was subtracted from the security deposit of $725.00 plus $84.81 interest and a refund of $321.22 was forwarded to Mr. Mason on April 4, 1975.

22. Plaintiff Frank Shannon is a black businessman who had a commercial account with Union Electric at 2901 Sheridan. The service period was from September 15, 1971 through the time of the trial. An initial deposit of $160.00 was requested by Union Electric on December 12, 1971, and the method of computation of this deposit amount cannot be verified because records are not available. An additional deposit of $75.00 was requested on December 26, 1973. This deposit amount was based upon the cost of electricity used from July 2, 1973 to August 1, 1973. Union Electric's charge of $117.00 for this time period when multiplied by 2 equals $234.00, and subtracting the initial deposit of $160.00 from this sum leaves $75.00 as the additional deposit required.[2] An examination of the billing statement for 2901 Sheridan shows that the customer forwarded bad checks in the amounts of $100.00, $150.00 and $248.08 before the initial deposit was requested in an attempt to retire outstanding debts with the Company. The billing statement also shows that the commercial account was repeatedly in arrears and bills sent to the customer were routinely paid late. After the additional deposit was requested Mr. Shannon sent Union Electric bad checks in the amounts of $320.57, $135.68 and $100.89 in an attempt to retire outstanding debts owed to the Company. Monthly bills for this account also continue to be paid late as of the time of trial.

23. Plaintiff Willie C. Smith is a black businessman who has had two commercial accounts with Union Electric. One account at 1424 Dielman Road was serviced from September 25, 1973 to November 18, 1974. A deposit of $940.00 was required by Union Electric. The method of calculation was based upon the cost of the amount of a predecessor's bill from February 6, 1973 to March 8, 1973. This amount was calculated at $470.32, and when multiplied by 2 equals $.64 more than the security deposit required by Union Electric. This $940.00 deposit to-

---

2. An additional deposit of $75.00 was requested by Union Electric on February 6, 1974. In effect the $75.00 additional deposit was erroneously requested twice.

gether with $46.22 of accrued interest was charged against a final bill of $1,208.73 leaving a balance of $222.51. Two checks in the amounts of $500.00 and $557.58 were forwarded to Union Electric in an effort to reduce outstanding balances on account. This final balance as of February 7, 1975 was transferred to an account of the same customer at 4281 Maffitt. The account at 4281 Maffitt shows a service period from November 18, 1974 to August 12, 1976. A security deposit of $270.00 was requested by Union Electric. The method of calculation of this deposit amount was garnered by examining the cost of a predecessor's bill from October 14, 1973 to November 5, 1973. This charge of $134.64 when multiplied by 2 is $.72 less than the amount of deposit initially requested by Union Electric. The $270.00 deposit together with $25.47 of accrued interest was offset against a final bill in the amount of $873.79 to leave a balance due of $578.32. On October 20, 1976, Union Electric charged off the $578.32 as uncollectible. An examination of billing statements for the commercial accounts at 1424 Dielman Road and 4281 Maffitt reveal that the customer continually paid his bills late. In addition, two additional bad checks in the amounts of $507.18 and $505.23 were forwarded by this customer in an attempt to offset outstanding balances due to Union Electric.

24. Plaintiff James Woods is a black businessman who had three commercial accounts with Union Electric. An account at 1618 Cole shows a service period of September 1, 1971 to June 27, 1974. A deposit amount of $384.00 was requested by Union Electric in October of 1971, and the method of calculation of this amount of deposit cannot be verified because of the unavailability of records. The deposit plus interest in the amount of $61.37 was applied to a final bill of $211.32 on June 27, 1974. A difference of $234.05 was refunded to Mr. Woods on July 9, 1974. On July 26, 1974, this commercial account was credited with $115.46 for a late payment which was received after the deposit and interest was applied to the final bill. The credit of this late payment resulted in another refund of

$115.46 being paid to the customer on July 26, 1974. The account at 1618 Cole was reinstated by the customer for a service period from June 27, 1974 to October 5, 1977. A deposit of $340.00 was requested by Union Electric, and the method of calculation of this amount was garnered from noting the charge of electricity from June 20, 1973 to July 20, 1973. This amount equaled $168.53, and when multiplied by 2 is comparable to the amount of initial deposit required. The deposit of $340.00 plus an interest amount calculated at $56.46 was applied to a final bill of $328.86. A refund in the amount of $67.60 was forwarded to Mr. Woods on November 16, 1977. An additional account at 6332 Myron was opened by Mr. James Woods. The service period of this account was from August 26, 1974 to the present time of the trial. A deposit of $85.00 was initially requested by Union Electric, and the method of calculation was based upon the cost of the predecessor's use of electricity from June 28, 1973 to July 30, 1973. This charge of $41.13 when multiplied by 2 is comparable to the $85.00 initial deposit requested by Union Electric. An additional deposit of $250.00 was requested by Union Electric on February 9, 1978. On February 17, 1978, this deposit request was cancelled after having been found to be in error.

25. William Tierney is a white businessman who was the predecessor to Mr. James Woods at the address, 6332 Myron. Mr. Tierney operated at this address from August 1, 1959 through August 26, 1974. A commercial security deposit of $50.00 was requested by Union Electric and paid on September 15, 1959.

26. Ronnie F. Ercker is a white businessman who had two commercial accounts with Union Electric. One account at 3220 Meramec was operated from November 6, 1970 to May 1, 1974. Union Electric required a total of $225.00 in deposit at this account. Mr. Ercker also had a business at 4211 Virginia from May 1, 1974 to March 10, 1975. The security deposit required at 3220 Meramec was transferred to the account at 4211 Virginia, and in addition

Union Electric required an additional $100.00 as a security deposit. Mr. Ercker also had a commercial account at 4213 Virginia. Union Electric requested a $100.00 deposit but this commercial account was closed before the deposit was paid.

27. Hugh Wilkinson is a white businessman who was a successor to the laundromat business operated by Frederick Lewis and his partners at 5458 Lillian and 500 Thekla. Mr. Wilkinson paid a $100.00 security deposit for his account at 5458 Lillian on October 21, 1960.

28. W. Berry is a white businessman from whom Frederick Lewis and his partners purchased a laundromat business at 5097 Union. Prior to the purchase of the laundromat by Lewis and his partners Mr. Berry paid a $156.00 security deposit on November 16, 1974 for his account at 5097 Union. A $150.00 security deposit was paid by Mr. Berry for his account at 3500 Magnolia on December 15, 1958. A $150.00 security deposit was paid by Mr. Berry for his account at 6370 Lillian on November 14, 1962.

29. Dwane Frye and Steve Geist are white businessmen who are predecessors to Mr. Willie Smith's commercial account at 1424 Dielman. Union Electric requested that Messrs. Frye and Geist pay deposit of $940.00 but the account was closed before this deposit was received. Additionally, another predecessor to the commercial account at 1424 Dielman, Uniware Corp., also paid a security deposit of $922.00.

30. Steve Geist did business under the name of Jiffy Market, Inc. Mr. Geist paid $1,520.00 as security deposit for his account at 5217 Lucas & Hunt Road. He also paid $1,565.00 as security deposit for his account at 8637 Olive Street Road.

31. Frank G. Koziacki is a white businessman who operated a market at 4600 Varrelman from 1970 to 1976. Mr. Koziacki paid a security deposit of $386.00 on October 20, 1970 for his account at 4600 Varrelman from 1970 to 1976.

32. Gregory Productions, Inc. is a corporation with ten principal investors. Three of the ten investors are black businessmen. Union Electric required this company at the address 2821 Lawton Promenade to pay a security deposit of $250.00, with payment being delayed because of a dispute over the amount of deposit. Eventually, Gregory Productions, Inc. was required to pay not only the $250.00 initial deposit but also an additional deposit of $240.00.

33. Marvin Soloman is a white businessman who had a commercial account with Union Electric at 2700 Cass, beginning in 1967. Initially, Mr. Soloman was not required to lodge a security deposit, but in June of 1970 Union Electric requested a $650.00 deposit. The amount charged equalled two months worth of electricity usage and was brought about because of a delinquent payment records and insufficient checks forwarded.

34. Leo N. Birenbaum is a white businessman operating the Town Pharmacy, the Euclid Pharmacy and Lee's Drug. Mr. Birenbaum has had a record of service as a commercial user of electricity with Union Electric dating back to 1948. Because of Mr. Birenbaum's long established, good credit rating he was not required to pay a deposit.

35. Hezekiah Lewis is a black businessman who had a business account with Union Electric at 1096 Union. On December 15, 1966, a $74.00 security deposit was paid as requested by Union Electric. On June 3, 1971, this deposit amount plus interest totaling $93.84 was refunded to Mr. Lewis. On August 18, 1976 an outstanding bill of $420.36 was charged off by Union Electric as uncollectible. Mr. Lewis had additional electric accounts at 1906 Union and 1910 Union. Union Electric required a $330.00 deposit at the 1906 Union commercial address. This amount was calculated by noting the charge for electricity from the period between July 1, 1974 and July 31, 1974, a sum of $164.54. This amount when doubled is comparable with the $330.00 security deposit required by Union Electric. This deposit amount together with accrued interest of $23.38 was applied to a final bill of $417.66. The outstanding balance of $64.28

owed by Mr. Lewis was charged off as uncollectible on October 19, 1976. Mr. Lewis also paid a security deposit of $1,070.00 for his account at 1910 Union. This deposit was calculated by noting the charge for electricity from the period July 1, 1974 to July 31, 1974, $534.67. This amount was doubled to arrive at a comparable amount to the deposit sum requested. The deposit plus interest, $1,150.77, was applied to a final bill of $3,576.33. An outstanding balance of $2,425.56 was charged off as uncollectible in October, 1976. Union Electric reviewed this account at 1910 Union and a credit adjustment of $174.51 was made. A balance due in the amount of $2,251.01 is still outstanding on Mr. Lewis's account.

36. James Beck, a black businessman, was asked to pay a $125.00 deposit for his account at 796 Bayard. Approximately two years later he was asked to pay an additional deposit of $75.00. By his own admission, Mr. Beck was delinquent in the payment of his electric bills and he could think of no other reason than his delinquent payments for the request by Union Electric for an additional $75.00 security deposit.

37. Eric Thomas, a black businessman, purchased a lounge at 2825 Lawton Promenade, the previous location of Gregory Productions, Inc. At the time of the purchase of the lounge the disconnection of the electricity to Gregory Productions, Inc. was incipient. Mr. Thomas was informed before he purchased the business that a $600.00 deposit based upon the electricity usage of Gregory Productions, Inc. would be required. Mr. Thomas's electricity was subsequently disconnected for non-payment of his electricity account.

38. James Jackson, a black businessman, operated a cleaners at 4575 Easton in 1945. Union Electric required a security deposit of $75.00 which was paid on December 14, 1962. An additional deposit of $25.00 was paid on June 6, 1963. This deposit of $100.00 plus $51.84 in accrued interest was applied to a final bill on September 17, 1971. In 1966 Mr. Jackson opened a market, J & J Inc., at 2904 N. Euclid. Union Electric informed Mr. Jackson that he would be required to pay a $372.00 security deposit. Because of a lack of company records, the method of deposit calculation is unknown.

39. Ivory Claxton, a black businessman, operated a grocery store at 1601 N. Union. Union Electric required Mr. Claxton to pay a security deposit of $150.00. This deposit was later refunded to his sister who took over the business. Mr. Claxton later operated the Golden Star Market at 3701 Cook Avenue, and he has not been required by Union Electric to pay a deposit for this account.

40. Elizabeth Taylor, a black businesswoman, operated a restaurant at 3538 Washington. A $1,000.00 deposit was requested by Union Electric. This deposit was based upon a predecessor's bill from May 24, 1974 to June 24, 1974 totaling $529.82. The charge of electricity for this period of time when doubled is comparable to the amount of deposit requested by Union Electric. The deposit amount plus accrued interest of $209.33 was applied to a final bill of $1,606.93. An outstanding balance due of $397.60 remains. The customer account was reinstated at 3538 Washington effective September 5, 1978. A $600.00 deposit was requested for this account and was based upon the average daily usage over a 133 day period showing a utility charge of approximately $10.00 per day. Service was disconnected for non-payment and the deposit plus accrued interest of $624.94 was applied to the final bill. The balance of $1,808.38 was charged off as uncollectible on December 19, 1979 by Union Electric.

41. The commercial operator at the business address prior to Ms. Taylor was Embassy Management Company run by a white businessman. Union Electric required a $750.00 security deposit for this account at 3538 Washington. Company records also show that this business paid eight other security deposits. It paid $810.00 on June 8, 1972; $450.00 on July 11, 1973; $725.00 on December 28, 1973; $450.00 on July 25, 1973; $262.00 on June 5, 1974;

$553.00 on May 31, 1974; $1,300.00 on July 11, 1973; and $750.00 on July 11, 1973.

42. Elbert Dorsey is a black attorney in a law firm located in St. Louis, Missouri. A $200.00 deposit was paid by Mr. Dorsey's firm, and was refunded with interest in the amount of $36.63 on April 28, 1978 because of the customer's good pay record.

43. William Upchurch is a research assistant employed by plaintiffs to investigate and prepare a study on black businesses in the City of St. Louis. He reviewed Union Electric's commercial customer list for the year 1978, and identified minority owned businesses which paid a security deposit.

44. Booker T. Middleton is plaintiff's expert witness. Middleton identified three zip code areas in the City of St. Louis as both "predominantly black" and three zip code areas in the City of St. Louis as "predominantly white".

45. Data generated by Upchurch and analyzed by Middleton concerning the size and number of commercial accounts for 1978 in these six zip code areas may be graphically illustrated as follows:

## Chart 1

| | | Black Business Zip Codes | | |
| --- | --- | --- | --- | --- |
| Amount of Deposit | City | 63112* | 63113* | 63115* |
| Less than $100 | 40% | 36% | 46% | 39% |
| $100 – 300 | 42% | 48% | 42% | 43% |
| $301 – 500 | 11% | 13% | 8% | 11% |
| $501 – 800 | 4% | 1% | 3% | 4% |
| $801 – 1000 | 1% | 1% | – | 2% |
| Over 1000 | 1% | 1% | 1% | 1% |
| Percent of Deposits Paid Which are Initial Deposits | 61% | 59% | 66% | 60% |

## Chart 2

| | White Business Zip Codes | | |
| --- | --- | --- | --- |
| Amount of Deposit | 63111** | 63116** | 63118** |
| Less than $100 | 44% | 44% | 39% |
| $100 – 300 | 46% | 41% | 46% |
| $301 – 500 | 8% | 9% | 10% |
| $501 – 800 | 1% | 3% | 3% |
| $801 – 1000 | – | 1% | 1% |
| Over 1000 | 1% | 2% | 1% |
| Percent of Deposits Paid Which are Initial Deposits | 65% | 59% | 63% |

## Chart 3

| Deposit Amount Paid | 63112* | 63111** | 63113* | 63118** | 63115* | 63116** |
| --- | --- | --- | --- | --- | --- | --- |
| Less than 100 | 56 | (41) | 106 | (100) | 80 | (71) |
| 100-300 | 66 | (57) | 17 | (118) | 82 | (76) |
| 301-500 | 21 | (11) | 23 | (39) | 29 | (17) |
| 501-800 | 4 | (9) | 10 | (16) | 15 | (10) |

| Deposit Amount Paid | 63112* | 63111** | 63113* | 63118** | 63115* | 63116** |
|---|---|---|---|---|---|---|
| 801-1000 | 1 | (0) | 1 | (5) | 2 | (0) |
| Over 1000 | 2 | (1) | 4 | (3) | 3 | (3) |
| Initial Deposit | 118 | (111) | 220 | (243) | 179 | (159) |
| Guarantor | 1 | (2) | 0 | (1) | 1 | (1) |

\* Predominantly Black
\*\* Predominantly White

---

46. Middleton testified that the same formula for devising the nature and amount of security deposits required for commercial accounts was utilized for both black and white businesses. He further testified that the same credit criteria for receiving the utility services of Union Electric was applied evenly for both black and white businesses.

### Conclusions of Law

This Court has jurisdiction over the parties herein and has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1343, 2201 and 2202 inasmuch as this action is brought pursuant to 42 U.S.C. § 1981, the Thirteenth and Fourteenth Amendments.

 Union Electric's commercial security deposit policy as authorized by the rules and regulations of the Missouri Public Service Commission—General Order No. 20, Rule 12—is constitutionally permissible on its face. The security deposit policy has as its sole purpose the economic end of assuring that Union Electric is shielded from losses incurred by a commercial customer's inability or unwillingness to pay for electricity. Because the record makes abundantly clear that the deposit policy is solely an economic measure, this Court must defer to the judgment of the Missouri Public Service Commission in its drafting of this order if there is a rational basis for its enactment. *New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).

Clearly, the challenged security deposit for commercial customers protects Union Electric's legitimate interests in insuring that justly owed obligations are met. Testimony revealed that Union Electric saved over $48,000 in 1978 through the use of these security deposits to offset debts from delinquent customers. With good reason, the Constitution does not prohibit the devisement and implementation of legislative rules the sole purpose for which is to protect a company from economic chaos. Any allegations that this commercial security deposit has been fashioned for reasons other than to insure some degree of economic safety for Union Electric are without foundation. Therefore the challenged commercial security deposit is constitutionally permissible on its face under the Equal Protection Clause of the Fourteenth Amendment.

 The commercial security deposit policy of Union Electric has not been applied in such a fashion so as to discriminate against black citizens in violation of 42 U.S.C. § 1981. Specifically, the plaintiffs allege, and sought to prove, that Union Electric denied to them certain contractual rights which the utility did extend to white businessmen. 42 U.S.C. § 1981 is an attempt by Congress to insure that contractual rights do not vary according to race. *Long v. Ford Motor Co.*, 496 F.2d 500 (6th Cir. 1974). State action is not a prerequisite to liability; a private citizen's (or corporate body's) refusal to enter into a contract with a plaintiff will violate 42 U.S.C. § 1981 if a consideration is based upon plaintiff's race. *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). A successful case under a theory of § 1981 would involve the marshalling of evidence that these black businessmen were deprived of the right to contract with Union Electric for electricity in the face of evidence that white businessmen were in fact accorded the same right. In short, the black businessmen must prove that Union Electric

treated them differently and in fact discriminated against them solely because of their race. *Greene v. Johns Hopkins University*, 469 F.Supp. 187 (D.C.Md.1979). And the burden of this proof lies with the plaintiffs. *Naraine v. Western Electric Co., Inc.*, 507 F.2d 590 (8th Cir. 1974).

The evidence adduced by plaintiffs at trial utterly fails to show that Union Electric practiced any such discrimination. Testimony presented at trial and summarized in the findings of fact show that customers, both black and white businessmen, were uniformly required to deposit the security charge with Union Electric based upon twice the amount of the highest month of customer usage. In the face of repeated assertions of imagined wrongs and alleged baseless overcharges, an account by account examination of the security deposit amounts charged, as well as determinations of when such charges were made, shows almost unerring accuracy in Union Electric's calculations. The detailed record of almost all plaintiffs reveals a sad and repeated pattern of late payments, no payments, payments with bad checks, and frequently debts in substantial amounts written off as uncollectible. The financial account history of many of the plaintiffs reveals a credit record so poor that the advancement on credit of the electricity needed to run a lemonade stand would have been fiscally irresponsible behavior on Union Electric's part. Indeed, the list of late payments and debts written off by Union Electric as uncollectible could have served as "Defendant's exhibit A" to justify this security deposit policy. In case after case plaintiffs' testimony concerning imagined grievances are contradicted by the uncontested billing records of the utility. And the evidence demonstrably shows that this commercial security deposit was applied to both black businessmen and white businessmen alike without any racially motivated intent to discriminate. No written documents, no policy statements, no billing records or practices, and no admissions by any Union Electric officials or other evidence suggests even a trace of improper racial motivation in the assessment of commercial security deposit by the utility. In fact, the testimony of plaintiffs' own expert witness, Booker Middleton, contained the stark admission that Union Electric was in no way guilty of any improper racial motivations when assessing security deposit amounts. Middleton was on record as acknowledging that the credit criteria of Union Electric in determining the necessity and amount of security deposits was uniformly applied to both black and white commercial customers. The credible evidence submitted wholly fails to support even an inference of racially motivated policies on the part of Union Electric.

Further, the plaintiffs failed to present any evidence that Union Electric's commercial security deposit policy had a disproportionate impact upon black businessmen as opposed to white businessmen. The statistical evidence amassed by plaintiffs fails to establish a favorable claim.[3] As evidenced by the number and distribution of security deposits arranged by zip codes—distinguishing black from white—no greater impact was felt by black as opposed to white businessmen. The plaintiffs' statistical study of "predominantly black zip codes (Chart 1) when compared with "predominantly white zip codes" (Chart 2) fails to reveal any disparate impact. When examined side by side (Chart 3), the distribution of businesses who pay deposits in these two areas reveals that similar percentages of white businesses in predominantly white areas pay a deposit amount comparable in frequency and

---

**3.** Serious questions concerning the validity of the statistics amassed by plaintiff abound. For instance, Upchurch characterized many of the businesses as black owned on the basis of the accent of the speaker in a phone conversation. And the plaintiffs' own witnesses could not agree on the definition of a black owned business. Thus, Middleton disagreed with Upchurch's characterization of a business owned or operated by blacks as a "black owned business." In addition, no distinction was drawn between those customers initially required to forward a deposit, and those who were later required to lodge a deposit because of slow payment practices or required subsequently to pay additional deposits for increased electricity usage.

amount to that required of black businessmen in predominantly black areas. In fact, the impact—in terms of percentages of businesses, which pay deposits and in terms of the amount required—falls upon black and white businesses alike.

And repeatedly the testimony of white businessmen and the company records indicated that white businessmen were also charged security deposits, often of a substantial sum (e. g., Steve Geist—$1,565.00 and $1,520.00). In fact, only one white businessman, Leo Birenbaum, paid no security deposit, and he was afforded this privilege based upon a solid record of prompt bill payments.[4]

Plaintiffs have failed to establish that the commercial security deposit of Union Electric was applied in any manner which would evidence a racial animus or that it in fact resulted in a disproportionate impact upon black businessmen.[5]

Accordingly, judgment will be entered for defendant.

4. However, even had such disproportionate impact upon black businessmen been proven, Union Electric's security deposit policy would not necessarily be unconstitutional. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) set forth the requirement that proof of racially discriminatory intent is necessary to establish a violation of the Equal Protection Clause. Furthermore, the standard of proof for an alleged violation of 42 U.S.C. § 1981 appears to parallel a claim of a violation of the Equal Protection Clause *of the Fourteenth Amendment. Johnson v. Hoffman*, 424 F.Supp. 490, 494 (E.D.Mo. 1977), aff'd sub nom. *Johnson v. Alexander*, 572 F.2d 1219 (8th Cir. 1978), *cert. denied*, 439 U.S. 986, 99 S.Ct. 579, 58 L.Ed.2d 658 (1978). This exact question—whether an alleged violation of § 1981 may be proven by the more lenient "Title VII disparate impact" test—has received much attention in the various federal courts throughout the country. The United States Supreme Court granted certiorari on this issue, but later declined to address the merits. *County of Los Angeles v. Davis*, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). Because the various courts have differed in their analysis, *cf. Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30*, 489 F.Supp. 282 (N.D.Cal-if.1980), with *Kinsey v. First Regional Securities, Inc.*, 557 F.2d 830 (D.C.Cir.1977), and because the Eighth Circuit's affirmation of Judge John F. Nangle in *Johnson v. Hoffman*, 424 F.Supp. 490 (E.D.Mo.1977) was not clearly based upon this issue, this Court also weighed the proof for evidence of disproportionate impact.

5. Plaintiffs also contend in their amended complaint that the commercial security deposit policy of Union Electric is applied in a fashion which discriminates against them in violation of the Thirteenth Amendment to the United States Constitution. The Thirteenth Amendment has been generally described as an attempt to secure the rights of all persons both black and white against race discrimination, or what is commonly referred to as "the badges and the incidence of slavery". *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). In essence, the Thirteenth Amendment is merely the Constitutional foundation for the statutory right enunciated in § 1981. Or in other words, § 1981 is the federal legislative enforcing act which § 2 of the Thirteenth Amendment allows. *Runyon v. McCrary*, 427 U.S. 160, 177–79, 96 S.Ct. 2586, 2597–98, 49 L.Ed.2d 415 (1976). A refusal of Union Electric to enter into a contract with black businessmen solely because of their race would be prohibited by the Thirteenth Amendment as well as § 1981. However, as the evidence overwhelmingly indicates there has been no such racially biased action on the part of Union Electric. Where there is no evidence of racial discrimination there can be no finding of a violation of the Thirteenth Amendment. Therefore, plaintiffs have failed to prove Union Electric's commercial security deposit policy is a violation of the Thirteenth Amendment.